IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF NORTH DAKOTA

IN RE:                          )
                                )   Chapter 11
KEELEY AND GRABANSKI            )
LAND PARTNERSHIP,               )   Bankruptcy No. 10-31482
                                )
        Debtor.                 )

**MEMORANDUM AND ORDER**

The Chapter 11 Trustee, Kip M. Kaler, filed a Motion under 11 U.S.C.

§ 1112(b) to convert this involuntary Chapter 11 case to Chapter 7.   Two parties

with claims against Debtor, John and Dawn Keeley and Choice Financial, joined the

Motion.   Debtor resisted.   The Court held an all-day evidentiary hearing on this

Motion on September 8, 2011.   After carefully considering this difficult case, the

Court concludes it should be converted from a Chapter 11 case to a Chapter 7 case.

## I.   FACTUAL BACKGROUND[1] AND FINDINGS OF FACT

This case is one of three separate, but related, bankruptcy cases.   The first

case is a voluntary Chapter 11 case filed by Thomas and Mari Grabanski on July 22,

---

[1] The Bankruptcy Appellate Panel for the Eighth Circuit (BAP) issued a decision in this case on September 6, 2011, affirming the Court's appointment of a Chapter 11 trustee.   The BAP provided a detailed recitation of many of the critical facts necessary to understanding the relationships between the many parties and entities with an interest in this conversion dispute.   This section includes many of the critical facts detailed by the BAP in order to provide content and background. This section also and most importantly includes findings based on the evidence presented at the hearing on this matter.

2010.   The second case is the voluntary Chapter 11 case of Grabanski Grain, LLC,

filed by the Grabanskis on July 23, 2010.   The third case – the one involved here –

is an involuntary Chapter 11 case filed by John and Dawn Keeley on December 7,

2010, against Keeley and Grabanski Land Partnership (KGLP), in which the

Keeleys and Grabanskis were partners.

## A.   Pre-Bankruptcy Facts

Thomas and Mari Grabanski are farmers who lived in North Dakota.   They

own and operate several farms and other agricultural businesses.   John and Dawn

Keeley are also North Dakota farmers.   The Grabanskis and Keeleys formed two

entities that are involved in this case.   One is Debtor, KGLP.

### 1.   KGLP

On February 1, 2007, the Keeleys and the Grabanskis formed KGLP, Debtor

in this case.   Thomas Grabanski and John Keeley were the managing partners.

KGLP purchased several tracts of farmland, including two large tracts in Texas.

Those two tracts are referred to by the parties as the "Lenth Parcel" and the "Unruh

Parcel."   Both tracts were subject to seller-financed mortgages.

The Grabanskis and the Keeleys, as partners of KGLP, purchased the Lenth

Parcel on February 5, 2007, just 4 days after forming KGLP.   They purchased it for

$2,340,000.00 plus 7% annual interest.    The promissory note in favor of the

Lenths provided for a payment of $208,000.00 by April 1, 2007, as a special

payment reflecting the final installment on the down payment. The principal loan balance was to be repaid in 10 yearly installments. Each represented 2% of the principal. There was a balloon payment for the balance at the end of 10 years. Thomas Grabanski testified that KGLP made the $208,000 payment by April 1, 2007. He says KGLP also made a $196,040 payment on February 1, 2008.

Irrigation equipment was installed on the Lenth Parcel shortly after purchase. Thomas Grabanski, John Keeley, Merlyn Grabanski, and Dolores Grabanski signed a lease agreement for the irrigation equipment on March 7, 2007 with Irrigation Finance Solutions, LLC. The lease provided for an initial payment of $49,137.99 on March 7, 2007. Four annual payments of $122,824.35 were to follow beginning March 7, 2008. The lease included a purchase option. Thomas Grabanski testified that KGLP owned the irrigation equipment and that it was his intention that the irrigation equipment would stay with the land.

### 2. G&K Farms

On January 1, 2008, the Keeleys and the Grabanskis formed G&K Farms, a partnership that would rent farmland owned by KGLP. KGLP was supposed to use the rents paid to it by G&K Farms to make the payments on the notes secured by the land. In order to conduct its farming operation in 2008, G&K Farms obtained financing from Choice Financial. To do so, G&K Farms provided a blanket lien to

3

Choice Financial on its property, including crops.   In February 2008, G&K Farms also obtained credit from United Agri Products to pay for fertilizer for its farming operations.

G&K Farms paid the annual payments for the irrigation equipment on the Lenth Parcel to Irrigation Finance Solutions on February 18, 2008, and March 6, 2009.   The 2010 payment was made by wire transfer on May 5, 2010.   The 2011 payment was not made and the lease went into default.   Thomas Grabanski testified that an additional $49,000.00 remains due to Irrigation Finance.   The total debt owing on the irrigation equipment is approximately $180,000.00.

KGLP purchased the Unruh Parcel on January 4, 2008 — just 3 days after the Grabanskis and Keeleys formed G&K Farms.   KGLP agreed to pay $3.6 million plus 6% interest.   The promissory note signed by the Grabanskis and the Keeleys provides for 15 consecutive annual payments. The first 14 annual payments are $370,665.95, and the final payment is the balance of the principal plus accrued interest.   The note required interest in the amount of 18% annually for all past due principal and interest from the date of maturity.

Although the farms should have been profitable, Thomas Grabanski informed the Keeleys in 2008 that G&K Farms had sustained a $2.5 million operating loss even though the crops had been insured.   The Grabanskis have not accounted for

this reported loss.   As a result of the losses, KGLP sold its properties, except the Lenth and Unruh Parcels.   The proceeds were used to partially pay down G&K Farms' operating line at Choice Financial.

The Keeleys assert that, in August 2008, Thomas Grabanski also obtained $7 million in secured financing from PHI Services, Inc.   He borrowed on behalf of G&K Farms and other entities in which he was involved.   He allegedly signed the PHI Services agreement on behalf of G&K Farms as a co-borrower, even though the operating agreement stated he could not borrow more than $1,000 without Keeley's permission.   The Keeleys assert that Grabanski falsely told them that he signed this note personally, rather than for G&K Farms.

In February 2009, G&K Farms borrowed an additional $1.2 million from Crop Production Services, Inc. for the 2009 growing season.   However, after planting its crop in 2009, G&K Farms discontinued operations.   The Keeleys have not been told where the proceeds of the crop sales or insurance proceeds from that season went.

In about May 2009, Thomas Grabanski told the Keeleys that he would pay all of G&K Farms' debt if the Keeleys would assign their partnership interest in both G&K Farms and KGLP to the Grabanskis.   On September 24, 2009, the Keeleys and the Grabanskis executed an Agreement to Assign Partnership Interests (the

"Transfer Agreement"), wherein the Keeleys agreed to assign their partnership interests effective April 30, 2009.   In the Transfer Agreement, the Grabanskis agreed to pay all of both partnerships' debts, liabilities, and expenses. The Keeleys were led to believe the G&K Farms' crop proceeds and insurance payments would be used to pay the Choice Financial operating line of credit.   As it turned out, very little of those proceeds went to pay down the Choice Financial line.

In 2010, the Grabanskis abandoned G&K Farms and created a new entity, Texas Family Farms, LLC.   That entity rented and farmed the Lenth and Unruh Parcels.   Despite farming the land, Texas Family Farms allegedly did not pay rent to KGLP.   KGLP in turn failed to pay the Lenth and Unruh note payments and payments on the irrigation equipment lease for 2010.   As discussed above, Thomas Grabanski testified that he was not certain whether these payments were made.   The Keeleys also assert that much of G&K's equipment has been re-titled to other Grabanski entities, traded in for other equipment, given away, or lost.

### 3.     G&K Workout with Choice Financial and Cross-Collateralizing

On May 5, 2010, G&K Farms and Choice Financial entered a workout agreement.   It dealt with G&K's debt to Choice Financial, including the 2009 line of credit in the amount of $1,204,514.10 plus interest and an equipment loan in the amount of $803,694.22 plus interest.   Thomas Grabanski testified that this

6

agreement was an extension because KGLP was unable to make its payments.   The
agreement recognized KGLP's outstanding obligations for the irrigation equipment
and to the Lenths.   Among other terms, the agreement provided that Choice
Financial would make the $128,965.57 irrigation payment by wire transfer.   Choice
Financial also would pay Eldon Lenth $70,000 to prevent him from foreclosing on
the property.   Choice Financial agreed to make a $200,000 loan to Texas Family
Farms, secured by an assignment of crop insurance and a crop mortgage.   The
majority of this loan was to be repaid from the 2010 crop insurance payment for a
loss of winter wheat on the Lenth Parcel.   The agreement further provided that a
minimum of $800,000 worth of crop proceeds would be paid from Texas Family
Farms' 2010 crop proceeds against G&K Farms' 2009 line of credit.   G&K Farms is
in default under the terms of the agreement.

### 4.    KGLP Payments and Financing for Lenth and Unruhs Parcels

Grabanski could not specifically recall payments made after 2008 on the
Lenth Parcel.   He thought KGLP got an extension for the 2009 payment and that it
was ultimately paid, but he was not sure.   He thought that a partial payment might
have been made in March 2010.   He knew no payments were made on the debt to
the Lenths in 2011.   He was also unsure whether taxes had been paid on the Lenth

7

Parcel in 2009.   He said it was unlikely that taxes were paid on the Lenth Parcel in 2010.

The first installment to the Unruhs was due on January 1, 2009. Notwithstanding that due date, Thomas Grabanski testified that mortgage payments were made to the Unruhs in 2008 and 2009.   He believed the entire 2010 mortgage payment was also made.   He was, however, not certain.   No payments were made to the Unruhs in 2011.   Thomas Grabanski was unsure how much remains owing to the Unruhs.

Dawn Keeley testified that the Keeleys made a personal loan of $180,000 to KGLP to finance one-half the payment due on the Unruh Parcel in January 2009. She played a voice mail message Thomas Grabanski left with her acknowledging that he would like to repay the debt.   He offered a repayment schedule, but he did not specifically say how KGLP would repay the debt.

On July 7, 2010, KGLP received a letter from the U.S. Department of Agriculture Natural Resources Conservation Services ("NRCS").   It indicated the NRCS would offer $2,563,000 for a conservation easement on 1,972 acres of the Lenth Parcel as part of a Wetlands Reserve Program.

Five days after KGLP received the NRCS's offer letter, the Lenths sent a notice to KGLP stating that it in default under its promissory note.   The unpaid

8

principal and accrued interest totaled $314,718.87 as of May 24, 2010.   The letter demanded payment of $2,144,077.50, plus $405.30 per day in accruing interest. The letter further stated that if the entire unpaid balance, plus accrued and unpaid interest, attorney's fees and expenses was not paid on or before August 31, 2010, the Lenths would commence foreclosure proceedings.

### 5.    The Grabanskis' Other Financial Troubles

While much of this was happening, the Grabanskis and their various entities defaulted on their loans from another lender, AgCountry Farm Credit Services. AgCountry obtained state court orders directing the Grabanskis to surrender AgCountry's collateral.   This included the Grabanskis' and the related entities' crops and equipment.   The Grabanskis disobeyed those orders.   The state court scheduled a contempt hearing for July 22, 2010, at 11:00 a.m.   The Grabanskis filed a voluntary Chapter 11 bankruptcy petition in their own names at 10:59 a.m. that day, staying the contempt hearing.

Grabanski Grain, LLC, of which the Grabanskis are sole members, was also indebted to AgCountry.   Grabanski Grain filed its own Chapter 11 on July 23, 2010. That case was converted to Chapter 7 on July 26, 2011.

**6.      Choice Financial Collections Against G&K Farms**

During the 2010 growing season, in approximately September, Choice

Financial sent a representative to Texas to collect G&K Farms' equipment.

According to Grabanski, the representative "boxed up" the equipment in a fenced

area.   Grabanski said Choice Financial seized everything.   He claims this included

property they did not have an interest in, such as property belonging to his father,

Texas Family Farms, and Thomas Grabanski personally.   He testified he could have

completed harvest by October, but Choice Financial's seizure of the equipment

effectively stopped all farming operations.   He claims this rendered KGLP unable

to meet its financial obligations.

Choice Financial liquidated the crop that had already been harvested.

However, according to Thomas Grabanski's testimony, Choice waited to harvest the

rest of the crop and burned some of the crop.   Choice Financial was still on the land

in December and the weather had turned rainy.   Grabanski had planned to plant

winter wheat as a double crop.   He claims it would have been planted by October.

When Choice Financial got off the land, Choice left it rutted and packed.

Grabanski said he was forced to plant corn as the double crop because it was too late

for wheat and the farmland was damaged.   The corn yield was terrible.   He

10

estimated that Choice Financial's repossession of the equipment cost the farming operation $1 million.

Even after the collection efforts, various Grabanski entities still owed Choice Financial a substantial amount of money.

### 7.    KGLP Lease and Income

On December 1, 2010, KGLP entered into a share crop farm lease with Louie Slominski, Jr., a fellow farmer from North Dakota — and a good friend of Grabanski.   Slominski transported his equipment to Texas, even though he had never farmed in Texas before.   Grabanski testified Slominski assumed considerable risk in moving $1.5 million of equipment to Texas.   Thus, Slominski needed a multi-year lease to make it worthwhile.   Grabanski, on behalf of KGLP, offered Slominski a three-year lease.   It provides that KGLP will receive 20% of the gross proceeds derived from the crops on the Unruh and Lenth Parcels or a minimum of $300,000 paid on November 1 of each year starting in 2011.   Grabanski testified that the gross proceeds include government and insurance payments.

Grabanski testified that KGLP has not received any lease payments from Slominski.   The payments are not due until November 2011.   He estimated that KGLP would receive $400,000 this year.   He intended to use the lease payments from Slominski to pay the Lenths and the Unruhs.

### 8.      The Keeleys as Creditors of KGLP

The Keeleys claim to be creditors of Debtor here, KGLP, because of their joint liability with the Grabanskis on various partnership debts.   The Grabanskis agreed to satisfy all partnership debts when the Keeleys transferred their ownership interest to the Grabanskis.   Nevertheless, several creditors of those partnerships sued the Keeleys to recover debts not paid by the partnership.   One of those creditors is PHI Financial.   PHI asserts it is owed over $7.2 million on the loan Grabanski took on behalf of G&K Farms without Keeley's authorization.   In that collection lawsuit, the Keeleys filed cross claims against the Grabanskis for, among other things, fraud.   Crop Production Services (another G&K creditor) also sued the Keeleys individually for nearly $800,000.

The Keeleys also allege that despite cash flow projections which showed Texas Family Farms would realize $2.3 million from crop sales to pay off some of the debt owed to Choice Financial, the Grabanskis only applied $100,000 to that debt.   The Keeleys assert the rest of the proceeds were improperly used for the benefit of Thomas Grabanski and Texas Family Farms.   As a result, Choice Financial has asserted that the Keeleys are liable for nearly $2 million in unpaid obligations from G&K Farms.   The Keeleys claim that, if Grabanski had applied

12

the crop sale proceeds appropriately, the Choice Financial debt would have been eliminated, or substantially reduced.

As noted above, the Keeleys also claim to be creditors of KGLP because of the $180,000 loan they provided for the January 2009 payment to the Unruhs.   The Keeleys offered Dawn Keeley's testimony and voice messages Thomas Grabanski left her confirming the loan.

### 9.    Choice Financial as KGLP Creditor

Choice Financial similarly has arguments, supported by evidence, that it is a creditor with a claim against KGLP.   In its workout with the various Grabanski entities, Choice provided value to KGLP in exchange for a valid security interest in KGLP land.   Grabanski himself admitted that Choice made a partial payment to the Lenths — an obligation owed by KGLP.   Grabanski also admitted Choice made an irrigation lease payment as part of the workout.    KGLP has, at many different times, claimed to own or have control over the irrigation equipment.   At a minimum, Choice Financial has a claim against Grabanski — the amount of which will be determined at a different time.

### 10.    Events Leading to KGLP Involuntary Bankruptcy

The Lenths — who went unpaid for long periods of time — eventually sent a notice of acceleration and demand to KGLP, the Keeleys, and the Grabanskis on

13

October 11, 2010.   The notice advised that the loan was being accelerated and the
Lenths were exercising their rights.   It further stated that in the event of foreclosure
resulting in an insufficiency to satisfy all sums due and owing, the borrowers and
guarantors would be jointly and severally liable.   The Lenth property was
scheduled for foreclosure sale on December 7, 2010.   Because Thomas Grabanski
took no action on behalf of KGLP in response to the notice of intent to foreclose or
notice of sale scheduled for December 7, 2010, the Keeleys, as creditors, initiated
this case by filing an involuntary bankruptcy petition against KGLP on December 6,
2010, in order to stay the foreclosure sale.

## B.     Events in the Bankruptcy Cases

### 1.     The Individual Bankruptcy Case

The Grabanskis had filed a voluntary Chapter 11 Petition on July 22, 2010.
After the Grabanskis requested three extensions for filing schedules and statements
in their individual case, alleging they needed more time to respond to motions and to
harvest crops, the deadline was extended to September 1, 2010.   On that day, the
Grabanskis filed some of the schedules, but did not file Schedules C and D or a
Statement of Financial Affairs until a week later.   According to the Keeleys, the
schedules contained significant inaccuracies, and were amended on October 20.
2010.   At that time, the Grabanskis disclosed an additional eleven personal

14

vehicles, $831,818.56 in secured debt, and $17 million in unsecured debt.   Parties have alleged that the schedules are still not accurate.

At least five creditors, including PHI Financial, Crop Production Services, and AgCountry, have filed adversary actions against the Grabanskis for, among other things, providing false financial statements in connection with their loans. The Keeleys have also filed an adversary proceeding alleging that Thomas Grabanski fraudulently transferred partnership assets, crop proceeds, and crop insurance for his own benefit and the benefit of his other farming operations. The Keeleys also assert that Grabanski misrepresented the true financial picture of the two partnerships in order to deprive the Keeleys of their partnership interests.

On August 2, 2010, AgCountry moved to appoint a trustee in the individual case, pointing to fraud in connection with its collateral, as well as dishonesty, incompetence, and gross mismanagement on the part of Thomas Grabanski.[2]   At least three other creditors joined AgCountry's motion to appoint a trustee.   The Grabanskis requested an extension of time to respond to that motion, again alleging a need to needing to respond to other motions and also to harvest crops.   The Grabanskis and AgCountry resolved that dispute by agreeing, among other things,

---

[2] AgCountry also alleged that, in a discovery deposition taken in January 2010, Thomas Grabanski asserted his Fifth Amendment privilege and refused to testify regarding the location and disposition of AgCountry's collateral.

that Thomas Grabanski and the Grabanskis' bookkeeper, Jennifer Tibert, submit to a Rule 2004 exam.[3]   According to AgCountry, the Grabanskis made several requests to postpone the Rule 2004 exams, each time alleging that either Thomas Grabanski or Jennifer Tibert was too sick to attend.   Ultimately, the Grabanskis filed formal requests for extension of the exams, asserting that both Thomas Grabanski and Jennifer Tibert were suffering from mental health problems as a result of these and related proceedings.   Thomas Grabanski's last motion requested a protective order staying the Rule 2004 exam indefinitely because he was suffering from depression and stress, and prohibiting AgCountry from filing any "punitive motions."

In response to the formal requests for extension, the Court continued the Rule 2004 exams of Thomas Grabanski and Jennifer Tibert for 14-day periods, but refused to permit further continuances without evidence from health care professionals that they were unable to competently take part in Rule 2004 examinations.   The Court denied the request for a protective order as to Thomas Grabanski.   According to the Trustee, when the Rule 2004 exams were held, Jennifer Tibert testified that she helped prepare the original schedules, but not the amended schedules.   Thomas Grabanski testified that he could not recall preparing

---

[3]  AgCountry asserted that Jennifer Tibert participated in the conspiracy to convert and hide AgCountry's collateral in violation of the state court orders to surrender the collateral to AgCountry.

16

the schedules or amended schedules, and could not vouch for the accuracy of the documents.

On November 22, 2010, the Grabanskis moved to extend the exclusivity period for filing a Chapter 11 plan and soliciting its acceptance.    The Grabanskis alleged, among other things, that they were working on a settlement with AgCountry that would free up money for the unsecured creditors and that they intended to file a plan and disclosure statement "on or before January 7, 2011."    AgCountry objected, stating the Grabanskis' request was not in good faith because they had made no attempt to negotiate or file a plan; had failed to produce fundamental facts and information; had refused to testify in good faith at the Rule 2004 examination; had not shown that they were paying bills when they came due; and had failed to file required monthly accounting reports.    The Keeleys also objected on the ground that the Grabanskis were withholding documents and information and had asked the Keeleys to preferentially transfer partnership property to Thomas Grabanski's father, Merlin Grabanski.    On December 21, 2010, the Court granted the Grabanskis' motion and extended the exclusivity period for filing a plan and disclosure statement until January 7, 2011 and for soliciting acceptances until March 6, 2011.

The January 7 deadline passed without a plan or disclosure statement being filed.   At a hearing on January 12, the Court ordered the Grabanskis to file a plan and disclosure statement no later than January 26 as a condition of continuing AgCountry's stay relief motion.   On January 25, 2011, rather than filing a plan and disclosure statement, the Grabanskis filed a "Plan of Debtors-in-Possession Regarding Motion of AgCountry Farm Credit Services PCA for Relief from Automatic Stay."   That "plan" stated only why the court should leave the automatic stay in place – it contained none of the elements of a plan required under 11 U.S.C. § 1123, nor was it accompanied by a disclosure statement as required under 11 U.S.C. § 1125.

On March 6, 2011, the Grabanskis filed a "Motion to Extend Period for Debtors to Solicit Acceptance of Plan," claiming to have made significant progress toward producing a feasible plan of reorganization by agreeing to sell property. They also argued that "favorable resolutions with secured creditors are in reality a condition precedent to producing a confirmable, feasible plan."

The United States Trustee, the Keeleys, and other creditors[4] objected, arguing the Grabanskis (1) had no plan for which to solicit acceptances, (2) had not filed a

---

[4]  These creditors included the Hanson-Tallackson Parties, PHI Financial Services, Inc., and Horse Creek Farms.

18

disclosure statement, (3) had not filed amended schedules, (4) were striking side deals with separate creditors instead of proposing solutions to all creditors through the plan process, and (5) had shown no proof of the alleged progress in developing a feasible plan.   In addition, the Grabanskis were attempting to obtain a *de facto* extension of the exclusivity period by obtaining an extension of time for gaining acceptances, in violation of § 1121(d)(1) of the Bankruptcy Code.[5]

By Order entered March 30, 2011, the Court denied the motion to extend the exclusivity period and ordered that, unless a plan and disclosure statement were filed within fifteen days, the case would be dismissed.   The Grabanskis appealed that Order.   The Court stayed the Order in that case pending the outcome of the appeal. The Bankruptcy Appellate Panel for the Eighth Circuit (BAP) dismissed that appeal because the Order denying the extension of the exclusivity period was not a final order.

On September 12, 2011, PHI Financial filed a motion to dismiss the case. Choice Financial filed a motion for relief from the stay on September 20, 2011. The Hanson-Tallackson Parties objected to the motion to dismiss and filed a motion to appoint an examiner on October 3, 2011.   These matters are pending.

## 2.    The KGLP Partnership Bankruptcy Case

---

[5] Section 1121(d)(1) requires that a request for an extension of the exclusivity period be made within such period.   11 U.S.C. § 1121(d)(1).

As stated above, on December 6, 2010, the Keeleys filed an involuntary petition against KGLP to stop a foreclosure on the Lenth Parcel.   When no Answer was filed, the Court entered an Order for Relief on January 7, 2011.   On January 10, 2011, KGLP moved to dismiss the case, asserting, among other things, that the Keeleys were no longer partners in KGLP, and that any claim they may have against the Debtor was subject to bona fide dispute as to liability or amount. The Keeleys opposed the dismissal.   On July 8, 2011, the Bankruptcy Court denied the motion to dismiss, on the ground that it was untimely filed.   The Court also granted a motion by the United States Trustee to compel performance, requiring KGLP to file its schedules, statement of financial affairs, list of twenty largest creditors and a mailing matrix of all parties in interest within 5 days.   Debtor filed a motion to extend the time to file these documents, which the Court denied.

Meanwhile, on February 3, 2011, the Keeleys moved for the appointment of an operating trustee in the KGLP case.   They alleged the Grabanskis fraudulently transferred assets out of the partnership and concealed liabilities in order to have the partnership incur additional debt for the Grabanskis' personal benefit.   They further pointed out that G&K Farms had had significant operating losses under Thomas Grabanski's direction, despite guaranteed income from crop insurance, and that the Grabanskis had not demonstrated why the farms reported operating losses.   They

20

also alleged that several of the creditors in the Grabanskis' individual case had

accused Thomas Grabanski of fraud and, indeed, several creditors filed adversary

proceedings in that case.   KGLP opposed the appointment of a trustee and,

following a hearing, the Court entered an Order on February 25, 2011, denying the

motion, but expressly authorizing the Keeleys to renew the motion at a later time.

On March 22, 2011, the Keeleys filed a second motion to appoint a trustee.

This time, in addition to the allegations of fraud and misconduct cited before, the

Keeleys asserted that circumstances surrounding an offer to purchase KGLP's land

necessitated the appointment of a trustee.

Specifically, they alleged that Kalin Flournoy, whom Thomas Grabanski had

hired in April 2009 to sell KGLP's farms, had received an offer in March 2011, from

U.S. Farming Realty Trust, L.P., to purchase the Lenth and Unruh Parcels for $3.5

million and $4.5 million, respectively.[6]   The offers included a provision that KGLP,

or a lessee designated by KGLP, could option to lease the land from the buyer after

the sale.   The offers even allowed KGLP to retain possession of the 2011 winter

wheat crop currently growing on the Unruh Parcel and provided the partnership the

right to enter upon the land for harvest.   On March 10, 2011, U.S. Farming

allegedly revised its offer to include $250,000 in earnest money for each parcel.

---

[6] The trustee ultimately assigned to this case testified that the U.S. Farming
offer was still viable as of June or July 2011.

According to the Keeleys, U.S. Farming was a reputable company with the wherewithal to accomplish the transaction.   However, on or about March 18, 2011, Thomas Grabanski and related parties allegedly began planting corn on the Lenth Parcel, apparently in an attempt to dissuade U.S. Farming from pursuing its offer further, and to enjoy farming the property for a second growing season without any associated land costs.   Despite requests from the Keeleys, Thomas Grabanski refused to respond to U.S. Farming's offer, even though, the Keeleys assert, accepting it would generate approximately $2.6 million in equity beyond the first mortgages that could be used to pay creditors. The Keeleys have asserted that if KGLP allowed the Lenths and the Unruhs to foreclose upon the properties, this equity, which could be available to pay creditors, would be lost.   Grabanski refused to respond even though he had previously expressly agreed to sell the Lenth Parcel if an offer for $3.5 million was received, which is the exact amount of the offer from U.S. Farming.[7]

Kalin Flourney testified at the hearing on the motion to appoint a trustee. After listing the Unruh Parcel for $4.5 million, Thomas Grabanski asked him to raise the price to $6.5 million and told Flournoy that he intended to lease it back from

---

[7] As part of the 2010 extension of the Choice Financial line of credit, Thomas Grabanski, on behalf of G&K Farms, expressly agreed with Choice that the Lenth Parcel would be sold if an offer of $3.5 million was made on it, with any equity proceeds being used to pay down the Choice Financial loans.

22

KGLP for two years.   Flournoy said he refused to raise the price because it would
virtually make the farm unsellable.   At that price, the buyer would not be able to
rely on lease payments alone to make the loan payments on the farm.   Flournoy
testified that one possible reason for this unreasonable increase in price was that
Grabanski had purchased adjacent land.

U.S. Industrial Services, LLC, also signed an undated purchase and sale
agreement that offered $5.8 million for both the Unruh and Lenth Parcels.   Thomas
Grabanski testified he intended to make that sale with irrigation equipment as part of
the transfer.   Under this agreement, KGLP was entitled to lease both properties
back from U.S. Industrial Services for $579,925 per year starting in August 2011.
This offer also included an exclusive option for KGLP to repurchase the properties
within five years of the closing date on the purchase agreement.   The purchase price
under the option to purchase is $6.5 million at an interest rate of 10%.

The United States Trustee joined in the motion for appointment of a trustee
because the Grabanskis were unduly delaying the administration of KGLP's estate.
In addition, creditors Choice Financial and the Unruhs joined the motion.   The
Lenths opposed the motion, essentially because there was a pending motion to
dismiss the case, and they preferred to proceed with their foreclosure.   The Lenths

23

also stated that, although the Keeleys were saying there was an offer on the table,

they would not disclose details, and that this made their position suspect.

At the hearing held on March 30, 2011, the Court considered both the

Grabanskis' request for extension of the exclusivity period in their own case, and the

motion to appoint a trustee in the KGLP case.   As stated above, the Court denied the

Grabanskis' request to extend the exclusive solicitation period because they had no

plan and the exclusivity period for filing a plan had lapsed on January 7.

The Court then found cause to appoint a trustee in the KGLP case.   The Court

stated, "I think it is time now to move forward with this case and either be successful

in the Chapter 11 reorganization or simply dismiss the case."   The Court stated that

the Grabanskis' history of unreasonable delay warranted the appointment.   KGLP

appealed.

On September 6, 2011, the BAP affirmed, concluding that cause to appoint a

trustee existed under section 1104(a)(1):

> In conjunction with the allegation that the Grabanskis
> have farmed the land without paying rent, the refusal of a
> reasonable offer to purchase the land, which KGLP itself
> put on the market, supports the conclusion that the
> Grabanskis are sabotaging attempts to sell, and are, it
> would appear, engaging in self-dealing.
>
> Moreover, even putting the allegations of fraud aside, the
> Bankruptcy Court's and U.S. Trustee's concern that
> neither KGLP, nor Thomas Grabanski, has any motivation

24

> to keep this case moving is well-founded. As shown
> above, Thomas Grabanski has proven himself unable or
> unwilling to move his own individual case along in a
> meaningful manner. And, given the numerous lawsuits
> and adversary proceedings pending against the Grabanskis
> and their other entities, and his own contention that he is
> suffering from depression and stress, it was reasonable to
> conclude that he is unable to devote sufficient attention to
> KGLP. Further, the significant unexplained operating
> losses of G&K Farms, which was supposed to support the
> loan payments on KGLP's land obligations, strongly
> suggests mismanagement on the part of Thomas
> Grabanski. The appointment of a trustee allows KGLP to
> be operated without the distractions and other motivations
> plaguing Thomas Grabanski.

In re Keeley and Grabanski Land Partnership, ___ B.R. ___, 2011 WL 3890316 at

*8-9 (B.A.P. 8th Cir. Sept. 6, 2011).   The BAP further concluded that the interests

of creditors and the estate warranted the appointment of a trustee under section

1104(a)(2) because:   the trustworthiness of KGLP's principals had been seriously

questioned; KGLP's past performance cast serious doubt on its prospects of

reorganization if left under the direction of Thomas Grabanski; and the evidence

suggested that the business community and creditors had lost all confidence in

Thomas Grabanski's ability to manage KGLP's affairs.

Kip Kaler was appointed the Chapter 11 trustee in the KGLP case.   He

testified that upon his appointment, he examined the case and contacted KGLP's

attorney to ask for further information.   He testified that he repeatedly — and over a

long period of time — asked Thomas Grabanski who owns the irrigation equipment

and was unable to get a straight answer.   He said that despite his requests for

records regarding past lease payments, he has not received them.   He likewise

testified that he asked for insurance information and only received some of it.

KGLP gave the trustee its 2009 tax return, which included $167,000 in gross income

and $455,000 in gross expenses.   KGLP said the 2010 tax return has not been filed.

The trustee said that he received virtually no financial documents from KGLP, and

that it is critical that someone with knowledge of KGLP complete the basic financial

disclosure requirements under the Bankruptcy Code.

The trustee went to Texas in May 2011 to inspect the property, the crops, and

the irrigation systems.   He testified that he asked Louie Slominski to terminate the

lease for 2012 and 2013, but Slominski refused.   The trustee has sued Louie

Slominski to terminate the lease.

KGLP filed a Chapter 11 plan of reorganization on September 7, 2011, the

day before the hearing in the matter presently before the Court.   KGLP's proposed

Chapter 11 plan is funded through the sale of the Lenth and Unruh Parcels to U.S.

Industrial Services for $5.8 million.   Under the proposed sale, KGLP has the

exclusive right to lease the land back from the purchaser, and it affords KGLP an

exclusive five-year option to repurchase the land.   The plan purports to pay the

Lenths and Unruhs in full, but it does not propose to pay interest to either of them.

Thomas Grabanski testified that the $180,000 outstanding obligation on the

irrigation equipment is not addressed in the plan, although the irrigation equipment

stays with the land.   The plan does not provide for the collection of lease payments.

The plan also expressly provides that KGLP will sell the Lenth Parcel free and clear

of any claimed interest of Choice Financial (which has a lien on the property), and

the Keeleys receive no payment under the plan.

          The trustee testified that it was his opinion that the $5.8 million offer from

U.S. Industrial Services is too low because he has an $8 million offer made by U.S.

Farm Realty.   According to the trustee, the representative of U.S. Industrial

Services, Robert Kattula, who signed the purchase and sale agreement, enters

bankruptcy cases and "scoops up" properties.   Indeed, Robert Kattula told the

trustee that the property is worth more than the $5.8 million offered by U.S.

Industrial Services.

          Under the plan, KGLP would make a $579,000 annual lease payment under

the farm lease contemplated by the purchase agreement with U.S. Industrial

Services.   When asked how that could be done given that he is only anticipating

lease payments totaling $400,000 from Louie Slominski this year, Thomas

Grabanski said that he now has proper equipment to be able to implement a double

crop system — one during the summer and one during the winter growing season.

He further testified that if KGLP's lease with Louie Slominski is terminated,

Slominski is aware that he may have to pay more to lease KGLP's land in the future.

Thomas Grabanski currently works for Louis Slominski as an employee and

receives approximately $1,800 every two weeks in wages.   Grabanski also lives in

the house on the Unruh Parcel.   He testified that the house is approximately 3,000

square feet and that its value is $200,000.   The listing agreement between KGLP

and Southern Plains Land Company,[8] however, lists the main house on the Unruh

Parcel as 3,598 square feet and valued at $305,830.   The Unruh Parcel also includes

a second home valued at $60,480, a mobile home valued at $15,000, and a barn and

bins valued at $1 million.

### 3.    Arguments for Conversion in KGLP Bankruptcy

The trustee filed the motion presently before the Court on July 21, 2011.   In

his motion to convert this Chapter 11 case to Chapter 7, the trustee alleges that cause

for conversion exists, including substantial and continuing loss or diminution of the

estate, the absence of a reasonable likelihood of rehabilitation, gross

mismanagement KGLP prior to the filing of this case, and the inability to confirm a

plan of reorganization.   The Keeleys joined the trustee's motion.   Debtor filed an

---

[8] Kalin Flourney is an agent of Southern Plains Land Company.

28

objection to the motion on August 5, 2011, alleging that conversion of the case would result in hardship to Debtor and its creditors.   A hearing was held on August 8, 2011.   As of that date, Debtor had not submitted a plan of reorganization.   The Court instructed Debtor to file a plan within 30 days and continued the motion.

On September 6, 2011, the trustee filed a supplemental brief in support of the motion to convert, which was joined by the Keeleys and Choice Financial.   The Keeleys and Choice Financial also asserted additional "cause" for conversion including:   failure of Debtor to follow filing requirements; failure of Debtor to follow Court orders; failure of Debtor to pay taxes due; and failure to file a disclosure statement.   Debtor filed the proposed plan of reorganization (discussed above) at 6:00 p.m. on September 7, 2010.   No disclosure statement accompanied the proposed plan.   The court heard the motion to convert on September 8, 2011.[9] As of the date of this Order, KGLP has not filed its schedules or statement of financial affairs.

Under 11 U.S.C. § 1112(b)(3), a Court "shall decide the motion not later than 15 days" after the hearing "unless movant expressly consents to a continuance for a specific period of time or compelling circumstances prevent the court from meeting [these] time limits."   The Court held the hearing all day September 8, 2011 and

---

[9] Any reference to the Court prior to September 8, 2011, relates to proceedings overseen by the Honorable William A. Hill.

requested post-hearing briefs.   The briefs were extensive.   The Court then held a

telephonic hearing regarding the (b)(3) time requirements.   All parties consented to

a decision date of October 7, 2011.   On October 7, 2011, the Court entered an order

finding compelling circumstances to extend the ruling date to October 11, 2011.

## II.   CONCLUSIONS OF LAW AND ANALYSIS

The trustee's motion to convert is brought under section 1112 of the

Bankruptcy Code, which provides in relevant part:

(b) (1)   **Except as provided in paragraph (2)** of this subsection,
subsection (c) of this section, and section 1104(a)(3), on request of a
party in interest, and after notice and a hearing, **absent unusual
circumstances** specifically identified by the court that establish that
the requested conversion or dismissal is not in the best interests of
creditors and the estate, **the court shall convert a case under this
chapter to a case under chapter 7** or dismiss a case under this
chapter, whichever is in the best interests of creditors and the estate, **if
the movant establishes cause.**

(2)   The **relief** provided in paragraph (1) **shall not be granted**
absent unusual circumstances specifically identified by the court that
establish that such relief is not in the best interests of creditors and the
estate, **if the debtor** or another party in interest objects and **establishes**
that –

(A) there is a **reasonable likelihood that a plan will be
confirmed within** the timeframes established in sections
1121(e) and **1129(e)** of this title, or if such sections do not apply,
within a reasonable period of time; **and**

(B) the **grounds for granting such relief include an act or
omission of the debtor other than under paragraph (4)(A)** –

30

> (i) or which there exists a reasonable justification for the
> act or omission; and
>
> (ii) that will be cured within a reasonable period of time
> fixed by the court.

11 U.S.C. § 1112(b)(1)-(2) (emphasis added).

Before the 2005 amendments to the Bankruptcy Code, — widely referred to

as BAPCPA — bankruptcy courts had broad discretion under § 1112(b) to convert a

case from Chapter 11 to Chapter 7.   In re Miell, 419 B.R. 357, 366 (Bankr. N.D.

Iowa 2009) (citing In re Hedquist, 450 F.3d 801, 804 (B.A.P. 8th Cir. 2006)

(applying pre-BAPCPA law)).

> Following BAPCPA's 2005 amendments to the Bankruptcy Code,
> section 1112(b)(1) is "no longer permissive, but instead mandates
> conversion or dismissal if the movant establishes exclusive cause, and
> no unusual circumstances establish that conversion or dismissal is not
> in the best interest of creditors."   However, "[w]hether cause exists
> under § 1112(b) and, if so, whether dismissal [or conversion] is
> appropriate are questions left to the sound discretion of the bankruptcy
> court."

In re Miell, 419 B.R. at 366 (quoting In re New Towne Development, LLC, 404 B.R.

140, 146 (Bankr. M.D. La. 2009) (citations omitted)).   "Thus, absent a showing of

'unusual circumstances,' if the moving party establishes that cause exists, it is the

Court's obligation to dismiss or convert a Chapter 11 case. Id. (citing In re New

Rochelle Telephone Corp., 397 B.R. 633, 640 (Bankr. E.D.N.Y. 2008)).

> [If] there is cause, no contravening unusual circumstances, and no
> applicable exceptions, the Court must convert or dismiss the Debtor's
> case pursuant to section 1112(b).   The test for determining one over
> the other is whether conversion or dismissal is in the best interests of
> creditors and the estate.   11 U.S.C. § 1112(b)(1).

Id. (quoting In re Pittsfield Weaving Co., 393 B.R. 271, 276 (Bankr. D.N.H. 2008)).

Under § 1112(b)(1), the movants have the initial burden to establish cause for

conversion.   Id. (citing In re Gateway Access Solutions, Inc., 374 B.R. 556, 561

(Bankr. M.D. Pa. 2007)).   "'Cause' includes 'substantial or continuing loss to or

diminution of the estate and the absence of a reasonable likelihood of rehabilitation,'

as well 15 other enumerated grounds included in § 1112(b)(4)(A) through (P)."   Id.

Between the Chapter 11 Trustee, Choice Financial, and the Keeley's, the moving

parties have argued seven of the "enumerated grounds" from § 1112(b)(4) provides

"cause" to convert the case.   The seven subsections included here are stated in the

statute as follows:

> For purposes of this subsection, the term "cause" includes –
>
> (a)    Substantial or continuing loss to or diminution of
>        the estate and the absence of a reasonable likelihood
>        of rehabilitation;
>
> (b)    Gross mismanagement of the estate;
>
> (e)    Failure to comply with an order of the court;

(f)     Unexcused failure to satisfy timely any filing or
        reporting requirement established by this title or by
        any rule applicable to a case under this chapter;

(h)     Failure timely to provide information or attend
        meetings reasonably requested by the United States
        trustee (or the bankruptcy administrator, if any);

(i)     Failure timely to pay taxes owed after the date of
        the order for relief or to file tax returns due after the
        date of the order for relief;

(j)     failure to file a disclosure statement, or to file or
        confirm a plan, within the time fixed by this title or
        by order of the court;

11 U.S.C. § 1112(b)(4).

        The statutory list of "causes" is not exhaustive.   In re Miell, 419 B.R. at 366

(citing In re Reagan, 403 B.R. 614, 620 (B.A.P. 8th Cir. 2009); In re DCNC North

Carolina I, LLC, 407 B.R. 651, 665 n.30 (Bankr. E.D. Pa. 2009)).   "The moving

party need not show all the enumerated items under § 1112(b)(4), even though

BAPCPA inserted the word 'and' instead of 'or,' which is likely a scrivener's error.

Id. at 366 (citing In re Products Int'l Co., 395 B.R. 101, 109-110 (Bankr. D. Ariz.

2008) (collecting cases)).

        A court may consider other factors and equitable considerations in making the

decision on conversion.   Id. (citing In re Kerr, 908 F.2d 400, 404 (8th Cir. 1990)).

"Negative cash flow alone can be sufficient cause to dismiss or convert under

§ 1112(b)." Id. (citing Loop Corp. v. United States Trustee, 379 F.3d 511, 515-16

(8th Cir. 2004)).

> Once "cause" has been **demonstrated**, the Court must **convert** or dismiss, **unless** the Court specifically identifies "**unusual circumstances** ... that establish that such relief is not in the best interest of creditors and the estate." 11 U.S.C. § 1112(b)(1). However, **absent unusual circumstances**, the **Court must not convert** or dismiss a case if [the debtor or other objecting party establishes that] (1) there is a reasonable likelihood that a **plan will be confirmed within a reasonable time**, (2) the "**cause**" for dismissal or conversion is something **other than** a **continuing loss or diminution** of the estate coupled with a lack of reasonable likelihood of rehabilitation; **and** (3) there is reasonable justification or **excuse for a debtor's act or omission and** the act or omission will be **cured within a reasonable time**. 11 U.S.C. § 1112(b)(2).

Id. at 366–67 (citing In re Orbit Petroleum, Inc., 395 B.R. 145, 148 (Bankr. D.N.M.

2008) (emphasis added)).

   If cause has been established, the burden shifts to Debtor to prove the case

falls within the "unusual circumstances" exception to § 1112(b)(1)'s mandatory

dismissal. Id. at 367 (citing In re Dovetail, 2008 WL 5644889, at * 4 (Bankr. N.D.

Ill. Dec. 31, 2008). The Code does not define "unusual circumstances." Id.

"Nevertheless, 'the import of section 1112(b) is that, if cause exists, the case should

be converted or dismissed unless unusual facts or circumstances demonstrate that

the purposes of chapter 11 would be better served by maintaining the case as a

chapter 11 proceeding.'" Id. at 367 (citing Orbit Petroleum, Inc., 395 B.R. at 149,

citing 7 Collier on Bankruptcy ¶ 1112.04[3], p. 1112-26 (Alan N. Resnick and

Henry J. Sommer, eds., 15th ed. rev. 2008)).   The phrase contemplates conditions

that are not common in Chapter 11 cases.   Pittsfield Weaving Co., 393 B.R. at 274.

"Courts have significant discretion in determining whether unusual circumstances

exist which weigh against conversion or dismissal."   In re Miell, 419 B.R. at 367

(citing Products Int'l Co., 395 B.R. at 109).

Debtor has devoted much of its resistance to arguing the Court should not

grant the request to convert this case from Chapter 11 to Chapter 7 because it would

defeat the overriding purposes of Chapter 11.   Debtor asserts that overriding

purpose to be reorganization, not liquidation.   Debtor is only partially correct in its

assertion of Chapter 11's purposes.

A Chapter 11 bankruptcy embraces the "two recognized policies of

preserving going concerns **and maximizing property** available to **satisfy**

**creditors**."   Bank of America Nat'l Trust & Sav. Ass'n v. 203 N. LaSalle Street

P'ship, 526 U.S. 434, 435 (1999) (cited and quoted in 7 *Collier on Bankruptcy* ¶

1112.04[5] at 1112-23) (emphasis added).   The Supreme Court cited *Collier on*

*Bankruptcy*, which discusses at greater length the tension between those two policies

and summarizes them as follows:

35

As a general rule, if continuing a particular chapter 11 case would promote the twin goals of preserving viable businesses **and maximizing the creditors' return**, then the case is probably not a candidate for conversion or dismissal under section 1112(b). On the other hand, chapter 11 is not a panacea for every debtor in distress. Many troubled businesses are simply not viable and most debtors that enter chapter 11 do not succeed in confirming a chapter 11 plan.   In addition, the costs of the reorganization process may outweigh the likely benefits in any particular case. Furthermore, liquidation does not always mean that the debtor's assets will be sold for scrap, and in some instances, the debtor's assets actually may be put to more valuable use in a different application. In these circumstances, permitting the chapter 11 case to continue may be counterproductive and conversion or dismissal may be warranted.

7 *Collier on Bankruptcy*   ¶ 1112.04[5][a] at 1112-24–1112-25 (emphasis added).

It is also important for courts evaluating the conversion question "to bear in mind that Congress designed the reorganization process to provide a forum for the negotiated resolution of the debtor's case in a manner that is as accommodating as possible."   Id. at 11-24[b].   Again, however, *Collier on Bankruptcy* notes the competing concerns:

On the other hand, not every case is capable of bearing the weight of this [negotiated resolution] ideal. In reality, while the chapter 11 forum provides a medium for negotiation and an opportunity to better accommodate the interests of a broad range of constituents by potentially preserving the value of the debtor as a going concern, the Code does not guarantee this result or even require its pursuit beyond the point at which the costs are not

36

> justified or the intended benefits of the process are
> unlikely to be obtained. . .
>
> To a certain degree, the accommodation of every interest
> in chapter 11 is almost always an impossible goal.   By
> definition, an insolvent debtor cannot satisfy all creditors
> in full, let alone provide a meaningful return for the
> debtor's equity participants in the typical case.

Id.

     While reorganization is a very important and fundamental part of the chapter 11 process, there are limits to how long and when it should be pursued.   "**The preservation of the business enterprise must not be at the expense of creditors**". Case v. Los Angeles Lumber Prods. Co., Ltd., 308 U.S. 106, 119 n. 14 (1939) (emphasis added).   See also In re Vista Foods U.S.A., Inc., 226 B.R. 284 (Table), 1997 WL 837774 (B.A.P. 10th Cir. 1997); In re AdBrite Co., 290 B.R. 209, 215 (Bankr. S.D.N.Y. 2003).   The Fifth Circuit has further explained:

> A principal goal of the reorganization provisions of the
> Bankruptcy Code is to benefit the creditors of the Chapter
> 11 debtor by preserving going-concern values and thereby
> enhancing the amounts recovered by all creditors ... .
> However, when there is no reasonable likelihood that the
> statutory objective of reorganization can be realized or
> when the debtor unreasonably delays, then the automatic
> stay and other statutory provisions designed to accomplish
> the reorganization objective become destructive of the
> legitimate rights and interests of creditors, the intended
> beneficiaries. In that situation it is incumbent upon the
> bankruptcy judge to effectuate the provisions of the
> Bankruptcy Code for the protection of creditors lest the

> judge keep the Code's word of promise to the ear of
> creditors and break it to their hope. The bankruptcy judge
> must meet head-on his obligation to decide, fairly and
> impartially, the hard questions.

United Sav. Ass'n of Tex v. Timbers of Inwood Forest Assocs., Ltd. (In re Timbers

of Inwood Forest Assocs., Ltd.), 808 F.2d 363, 373 (5th Cir. 1987)(en banc), aff'd,

484 U.S. 365 (1988)).

> Thus, although a request for relief under section 1112(b)
> may bring to the court a **variety of difficult choices** that
> might otherwise be left to the negotiating table, this is one
> of the section's chief virtues.   Specifically, it permits the
> court to evaluate whether the process is worth the effort,
> or, conversely, whether the process continues simply
> because the parties are forced to participate.

7 *Collier on Bankruptcy* ¶ 1112.04[5][b] at 1112-25–1112-26 (emphasis added).

Debtors also argued that, at a minimum, it should have a chance to confirm a

plan.   Again, *Collier on Bankruptcy* summarizes the competing concerns on this

point and the additional difficult questions they pose for the court:

> Similarly, given the hard **choices that the court
> may face in some cases**, it may be tempting to postpone
> the decision to convert or dismiss until the conclusion of
> the confirmation process. One of the clearest indicators of
> whether a reorganization can succeed is whether the
> debtor or some other party in interest is actually able to
> confirm a plan, which may not be known conclusively
> until the end of the chapter 11 saga. On the other hand,
> waiting until the case has conclusively foundered on the
> shoals of confirmation is often expensive and inefficient
> in the extreme and, as a general policy, is contraindicated

38

by section 1112(b). **Certainly the ability to confirm a plan is a most significant consideration in the chapter 11 context, but it is a mistake to conclude that consideration of section 1112(b) should begin only after the confirmation process has ended.** Care must be taken so that the court's discretion does not inevitably shelter inefficiency and injustice at the expense of the parties or the chapter 11 process as a whole.

Id. ¶ 1112.04[5][c] at 1112-26 (emphasis added).    This Court is faced with many of the hard choice and strong competing concerns addressed above.

Here, a Chapter 11 Trustee was appointed to oversee a number of very serious concerns raised early in the case about Debtor's management of this business and the propriety of many of the transactions involving and surrounding Debtor.   After investigating Debtor's operation, its property and holdings, and its future prospects, the Chapter 11 Trustee acted on its duty under § 1104 to report to the Court what he found.   The Chapter 11 Trustee's report was essentially a recommendation that the case should be converted under § 1112(b).   Choice Financial and the Keeleys, both claiming to be creditors, joined in the Trustee's Motion to Convert the case. The Lenths and Unruhs did not join.   However, the Lenths attended the hearing on the Motion to Convert.   They specifically indicated an unwillingness to take any kind of reduction in payment or other adverse treatment under Debtor's proposed plan.   The Lenths offered no support for Debtor's resistance to conversion.   To the extent they took a position, it appeared to favor conversion.

39

Debtor objected to conversion.   It provided a proposed plan on the eve of the

hearing.   The Court must now resolve this issue under the above analysis and with

the above foundational principles in mind.

### A.   Movant's Burden of Establishing "Cause" for Conversion

"The initial burden lies with the movants to establish a cause for conversion"

under § 1112(b)(1).   Miell, 419 B.R. at 366.   The movants have claimed seven

different statutory bases for cause.   The Court will address each individually.

### 1.   Substantial or Continuing Loss to or Diminution of the Estate and the Absence of a Reasonable Likelihood of Rehabilitation – Section 1112(b)(4)(A)

Under § 1112(b)(4), "the term 'cause' includes – (A) substantial or continuing

loss to or diminution of the estate and the absence of a reasonable likelihood of

rehabilitation."   11 U.S.C. § 1112(b)(4)(A).   Movants must establish both:   (1) a

substantial and continuing loss of or diminution of the estate; and (2) absence of a

reasonable likelihood of rehabilitation to establish "cause" under § 1112(b)(4)(A).

However, if the moving parties establish both of those elements, the exceptions to

mandatory conversion in § 1112(b)(2) do not apply.   This is because one element of

the (b)(2) exception is that the cause resulting in mandatory conversion is "other

than under paragraph (4)(A)."   Thus, if movants can establish cause under

§ 1112(b)(4)(A), the only way Debtor can avoid conversion is to show "unusual

40

circumstances specifically identified. . .that establish that the requested

conversion. . .is not in the best interest of creditors or the estate."   11 U.S.C.

§ 1112(b)(1).

The Court, after carefully and thoroughly reviewing this matter, concludes

that movants have established a substantial and continuing diminution or loss to the

estate and the absence of a reasonable likelihood of rehabilitation of Debtor – both of

the required elements under § 1112(b)(4)(A).   The movants established a

continuing loss or diminution to the estate with the testimony of the Chapter 11

Trustee, the exhibits offered, and other critical evidence from the hearing.   The

Trustee testified and the exhibits establish that even if the notes on both the Lenth

and Unruh Parcels were current, Debtor would need at least $566,695.95 to meets its

monthly obligations to these first position creditors.   The undisputed testimony is

that Debtor currently has only $400,000 in rent coming from a lease on the property.

This is Debtor's only income.   On that basis alone, there is not enough income to

meet even the basic monthly obligations.   As the Trustee testified, Debtor has not

made any payments to those creditors in some time.   This has resulted in continuing

accrual of additional unpaid interest and penalties which put the obligations on these

Parcels further out-of-reach for Debtors.

Debtor does not really dispute those facts.   Instead, Debtor suggests that, because the notes have been accelerated and are in default, the additional missed monthly payments no longer matter.   It asserts its real obligation is to pay off the existing principal balance.   Debtor claims in its proposed plan that it pays off the existing principal balances.   However, as the Trustee and the other moving parties have pointed out, this does not include payment of the accrued interest and penalties based on earlier failures to pay.   Debtor failed to provide any evidence that either the Lenths or the Unruhs were willing to take less than the full amount of their debt to which they are entitled — including accrued interest and penalties.   In particular, the Lenths indicated that they had no intention of taking less than the full amount of principal and interest due to them.   Debtors plan does not include these amounts.

The movants further established, and Mr. Grabanski confirmed, that there was an additional $12,560 in unpaid real estate taxes.   This is also nowhere accounted for in the plan.   In sum, the undisputed obligations are not being paid and there is a substantial and continuing diminution of the estate by accrual of additional interest and penalties — even under the proposals made in Debtor's plan.

The movants have also established through testimony and exhibits that there is no reasonable likelihood of rehabilitation of Debtor.   Movants have shown there is no reasonable likelihood of rehabilitation of Debtor here.   The current leasing

42

income (the only source of income) is not sufficient to meet current obligations.

Debtor's proposal to pay those obligations in full based on the sale and lease-back

arrangement in its plan is insufficient proof of Debtor's reasonable likelihood to

rehabilitate.   As noted, the amounts to be generated by the proposed sale in

Debtor's plan are still less than the amounts due and owing on the Lenth and Unruh

Parcels.

While these facts alone establish an absence of a reasonable likelihood of

rehabilitation of Debtor, additional facts demonstrate further absence of a reasonable

likelihood of rehabilitation.   All of Debtor's proposals and arguments assume that

Debtor owes nothing to the Keeley's or Choice Financial.   The evidence presented,

however, establishes a strong likelihood that the Keeley's and Choice Financial both

have viable claims against Debtor.

The Court, therefore, concludes the movants have established cause under

§ 1112(b)(4)(A).

## 2.    Gross Mismanagement of the Affairs of Debtor – Section 1112(b)(4)(B)

The next ground for "cause" to convert the movants have argued for is gross

mismanagement of the estate by Debtor.   11 U.S.C. § 1112(b)(4)(B).   To prove

"gross mismanagement of the estate", the movants must show that Debtor engage in

gross mismanagement of the estate after the case was filed.   The movants have

failed to make such a showing.

The movants all point to the lease Debtor entered into with his friend,

Slominsky, to support gross mismanagement arguments.   It is virtually undisputed

that this lease was made prepetition.   As such, it cannot be used to demonstrate

gross mismanagement of the estate post-petition.   Further, during the vast majority

of the time Debtor has been in bankruptcy, the Chapter 11 Trustee has been in charge

of managing Debtor.   As such, the Court concludes that the moving parties have

failed to prove gross mismanagement of the estate and, therefore, failed to prove

cause for conversion under § 1112(b)(4)(B).

**3.      Failure to Timely Satisfy Filing Requirement and/or
        Failure to Comply with the Court Order – Section 1112(b)(4)(E)
        and (F)**

Movants can also show cause for conversion for a failure to comply with the

Court order, § 1112(b)(4)(E), or the inexcusable failure to timely satisfy the filing

requirement, 11 U.S.C. § 1112(b)(4)(F).   Movants all point to the same conduct for

establishing either or both of these causes for conversion — Debtor's failure to file

its schedules, statement of affairs, and other required documents.   Thus, the Court

addresses these arguments together.

44

Debtor, like all bankruptcy debtors, faced "filing requirements" from the early days of the case.   "In an involuntary case, the list in subdivision (a)(2), and the schedules, statements, and other documents required by subdivision (b)(1) shall be filed by the debtor within 14 days of the entry of the order for relief." Fed. R. Bankr. P. 1007(c).   It is undisputed the Court entered the order for relief in this case on January 7, 2011.   Under the applicable law, Debtor was required to have the documents on file by January 21, 2011.   Debtor did not timely comply with this filing requirement.   Debtor has never complied with the Rule 1007(c) requirement at all.   None of these documents required by Rule 1007(c) have ever been filed.

The Court issued an order on July 8, 2011 specifically directing Debtor to file those schedules, statement of affairs, and other documents by July 13, 2011.   It is undisputed that Debtor has failed to comply with the Court order.   Debtor did not file the documents by July 13, 2011.   Debtor has never filed the documents.   The Court concludes that these undisputed failure to file the schedules and statement of affairs establishes sufficient cause for conversion under § 1112(b)(4)(E) and (F).

Debtor actually admits that it did not file the statement of affairs, schedules, or any of the other documents.   Mr. Grabanski admitted he was aware of the Court

45

order requiring him to file the documents and that he did not file them.   He said he

was relying on counsel to do whatever was necessary.

Debtor's counsel argues that while the documents have never been filed, the

information has essentially been provided in an affidavit and oral testimony.

Debtor argues that there is no point in filing specific documents, schedules and

statement of affairs, and a list of creditors when "the lion's share of information has

been provided by other means."   Debtor's Post-Hearing Brief at fn. 1.   Debtor also

believes these arguments are really "form over substance."   Id.

Debtor has seriously underestimated the importance of the filing of these

schedules, statement of affairs, and a list of creditors in this case.   These are

fundamental and foundation documents in any bankruptcy.

Judge Hill summarized the importance of the schedules and statement of

affairs in a 1999 case in this district.

> It is a "fundamental necessity in bankruptcy" that the
> information which debtors provide in their petition,
> schedules and statement of financial affairs be accurate,
> thorough, and reliable.   In this respect, debtor has a
> uncompromising duty to disclose whatever ownership
> interest he holds in property.   The importance of these
> pronouncements cannot be understated; the bankruptcy
> system as a whole and each particular case which forms a
> component part of it, cannot function without the honest
> and forthcoming efforts of its debtors.

46

In re McLaren, 236 B.R. 882, 894 (Bankr. D.N.D. 1999)(quoted and cited sources

omitted).   Judge Hill's recitation of the applicable law has been reiterated

innumerable times by other bankruptcy courts in equally stark and plain terms.   One

bankruptcy court collected quotations from many of those other courts and recited

them as follows:

> The Sixth Circuit recently stated a debtor has an
> affirmative duty to disclose all of its assets in the
> bankruptcy court . . . that debtors have a duty to truthfully
> answer questions presented in the various schedules and
> filings carefully, completely and accurately.   The debtor
> is imposed with the **paramount duty** to carefully consider
> all questions and the schedules and statements to see that
> each is answered **accurately and completely**.   The
> burden is on the debtors to complete their schedules
> accurately.   The bankruptcy laws impose a **strict
> obligation** on debtors to file **complete and accurate**
> schedules.

In re Cutler, 291 B.R. 718, 726–27 (Bankr. E.D. Mich. 2003) (numerous quoted and

cited cases omitted) (emphasis added).   Another Court noted:   "The schedules and

statement of affairs are **one of the most important duties of the debtor's

attorney**."   In re Dennis, 164 B.R. 318, 320 (Bankr. D. Ariz. 1994) (citing Collier

on Bankruptcy) (emphasis added).

Another court simply stated:

> **We cannot emphasize strong enough** that it is important
> **that debtors complete their schedules accurately**.
> They are, of course, prepared on a self-declaratory honor

> system.   The debtor's duty of full disclosure is the quid
> pro quo [the benefits of a bankruptcy]...[the purpose of
> these requirements] is to ensure that debtors provide
> reliable information to those with an interest in the
> administration of debtor's estate.   Creditors are entitled to
> truthful statements in a debtor's statement of financial
> affairs so they may conduct their own investigation of
> those affairs.

In re Katz, 203 B.R. 227, 233 (Bankr. E.D. PA. 1996) (cited and quoted cases

omitted) (emphasis added).

Another court summarized the requirements as follows:

> A **debtor's duty to fully and accurately disclose** all
> legal or equitable interest in property **on the bankruptcy
> schedules is paramount and absolute**.   A debtor's duty
> to fully disclosure imposes and **uncompromising duty** to
> carefully and truthfully answer all questions presented in
> the bankruptcy schedules and statement of affairs.   The
> **very integrity of the bankruptcy** court and the
> successful administration of the bankruptcy **system rests
> upon compliance with debtor's obligations of
> disclosure**.

In re Peterson, 296 B.R. 766, 790 (Bankr. C.D. Ill. 2003) (cited and quoted cases

omitted) (emphasis added).

Numerous other cases are to the same effect.   See e.g. In re Rolland, 317 B.R.

402, 413 (Bankr. C.D. Cal. 2004)(citing and quoting numerous cases for the

propositions that "debtors have an absolute duty to file complete and accurate

schedules"; "full and comprehensive disclosure is critical to the integrity of the

bankruptcy process"; "the veracity of debtor's statements is absolutely essential to
the administration of the bankruptcy code"; "the proper operation of the bankruptcy
system depends on honest reporting"); In re Abramov, 329 B.R. 125, 134–135
(Bankr. E.D.N.Y. 2005) (noting the determination of relevance and importance of
property for an estate is not the debtor's decision to make and that instead "it is the
debtor's role to simply consider the question carefully and answer it completely and
accurately."); In re Costello, 299 B.R. 882 (Bankr. E.D. Ill. 2003)("debtor must
disclose all ownership interest he holds in property" and "the trustee and creditors
are entitled to honest and accurate sign posts on the trail showing what property has
passed through the debtor's hands during the period prior to his bankruptcy" and
other similar statements).   See also In re Kasden, 209 B.R. 239, 243–44 (B.A.P. 8th
Cir. 1997); In re Leech, 408 B.R. 222, 226 (Bankr. E.D. Wis. 2009); In re Hensley,
318 B.R. 699, 705 (Bankr. N.D. Ind. 2007); In re Whitehead, 278 B.R. 589, 594
(Bankr. M.D. Fla. 2002); In re Schroff, 156 B.R. 250, 256 (Bankr. W.D. Mo. 1993).

These duties are extensive and absolute.   As one court noted:

> Debtor must file a list of creditors, and unless the court
> orders otherwise, a schedule of assets and liabilities,
> schedule of income and current expenditures, and a
> statement of debtor's financial affairs, cooperate with
> trustee as necessary to enable the trustee to perform the
> trustee's duties, and surrender to the trustee any record,
> recorded information, including books, documents or
> records, papers relating to the property of the estate.

49

<u>In re Matus</u>, 303 B.R. 660, 675 (Bankr. N.D. Ga. 2004).   That case went on to note

that:

> It is not for the debtor to decide what is and what is not
> relevant.   A debtor who admits important information
> and fails to make full disclosures, places to write to
> discharge in serious jeopardy.   In fact, creditors are
> entitled to judgment for themselves what will benefit and
> what will prejudice them and the estate.

<u>Id</u>.

In a particular note to this case, several courts noted that the "absolute duty"

prevents Debtor from arguing that "omissions in the bankrupcty filings were de

minimus or immaterial."   <u>In re Peterson</u>, 356 B.R. 468, 478 (Bankr. N.D. Iowa

2006).   In fact, one court specifically addressed essentially the same arguments

Debtor makes here and rejected them.   Summarily:

> [D]ebtor contends that his attorneys "<u>openly discussed
> and fully disclosed</u>" potential claims during the telephone
> conversations with counsel for the committee.   Such
> **informal oral disclosure is insufficient and is not a
> substitute for the mandatory filing of formal schedules**
> as required by Bankruptcy Rule 1007(b).   <u>See</u> <u>In re
> Fedder</u>, 218 B.R. 262 (Bankr. D.D.C. 1997) (holding that
> oral disclosure regarding property exemptions at a section
> 341 meeting of creditors did not substitute for mandatory
> disclosure under Bankruptcy Rule 1007(b)); <u>In re Moore</u>,
> 175 B.R. 13, 17 (Bankr. S.D. Ohio 1994) (the Bankruptcy
> Code does not authorize debtors or their counsel to simply
> present words on the wind at a section 341 meeting or in
> any other circumstance).

<u>In re Kunica v. St. Jean Fin., Inc.</u>, 233 B.R. 46, 56–57 (S.D.N.Y. 1999) (emphasis added).

Based on all of the above authority, the Court rejects Debtor's arguments that the filing of formal statement of affairs, schedules and list of creditors is not required in this case.   Similarly, the Court rejects Debtor's argument that providing this information in different forms at different times essentially complies with those duties.   The fact is that the filing of schedules, statement of affairs, and accompanying documents is fundamental to the proper analysis and review of bankruptcy proceedings.   The failure to do so here cannot be excused nor minimized.   In fact, many of the problems in communication and the questions about fraud and improper dealing have come about because of the failure to properly follow disclosure requirements.

Thus, the Court rejects Debtor's arguments that the failure to file the applicable documents under the time deadlines established in the rule-based filing requirement and the Court's order are not cause for conversion.   The undisputed evidence demonstrates that Debtor has failed to meet the filing requirements and has failed to comply with Court orders.   Movants have established cause under § 1112(b)(4)(E) and (F).

### 4.     Failure to Timely File Disclosure Statement

Movants next argue cause for conversion exists where movant shows that

Debtor has failed to timely file a disclosure statement.    11 U.S.C. § 1112(b)(4)(J).

To establish this element of cause, the movants must show that Debtor failed to

timely file a disclosure statement.    The undisputed record reveals that no disclosure

statement was filed.    Like the schedules and statement of affairs, Debtor argues

only that the disclosure statement is not necessary given the unique posture of this

case.    For reasons similar to those stated in discussing the failure to follow filing

requirements and Court orders, the Court rejects Debtor's arguments.    The Court

finds that cause exists for conversion for Debtor's failure to timely file a disclosure

statement with its proposed plan.    Thus, movants have established cause under

§ 1112(b)(4)(J).

### 5.     Failure to Timely Pay Taxes Owed after the Order for Relief is Entered

Movants also argue Debtor's failure to timely pay taxes owed after an order

for relief is entered is cause for conversion under § 1112(b)(4)(I).    The record is

undisputed that Debtor has property taxes due and owing of $12,560.07.    Debtor's

plan identifies them specifically.    Grabanski offered no explanation when the taxes

arose or what they were for.    Grabanski offered no evidence to contradict the

arguments of the moving parties that the $12,560.07 represents the unpaid taxes for

52

the first-half of 2011 accruing after the filing of the involuntary case.   Debtor's

acknowledgment of the tax due and owing and failure to explain when it arose,

further demonstrates cause for conversion under § 1112(b)(4)(I).

## B.    Debtor's Burden to Establish Unusual Circumstances and Conversion is not in the Best Interest of Creditors and the Estate

If movants establish "cause", the Court is required to convert the Chapter 11

case to a case under Chapter 7 unless there are unusual circumstances that are

specifically identified that demonstrate conversion is not in the best interests of

creditors and/or the estate.   In re Miell, 419 B.R. at 367 (quoting In re Pittsburgh

Weaving, 393 B.R. at 276).   The Court has found no such unusual circumstances in

this case.

Debtor has argued in a vague fashion at different points for the unusual

circumstances.   The Court has not, however, been able to decipher any unusual

circumstances that would argue against conversion.   However, even assuming this

case contains "unusual circumstances" there has been no demonstration by Debtor

that conversion is "not in the best interests of creditors and the estate."

No creditor has resisted conversion.   In fact, the creditors taking positions on

the issue have all come down very strongly on the side of conversion.   None of

those creditors believe it is in their best interests to continue in Chapter 11.   In fact,

all the evidence is to the contrary.

53

The creditors have presented evidence that they and the entire estate would be substantially better off by a conversion to Chapter 7.   The Chapter 11 Trustee testified that there is a very strong likelihood that he would be able to sell the property for $2.2 million dollars more than Debtor proposes under the plan.   That means $2.2 million dollars more would be available to creditors in the Trustee's proposed Chapter 7 liquidation than in Debtor's Chapter 11 proposed plan.   As noted above, even in Debtor's proposed plan, there is no way for Debtor to pay the principal, accrued interest, and taxes owed already on the first mortgage holders Lenth and Unruh Parcels.   These are two creditors that Debtor specifically admits it owes.   Even these creditors would stand to benefit from a conversion.   Conversely, those creditors would not been better off continuing in a Chapter 11.

## III.   EXCEPTION TO MANDATORY CONVERSION – SECTION 1112(b)(2)

Even if cause has been established and there are no "unusual circumstances", the Court must nevertheless consider the § 1112(b)(2) exception to mandatory conversion based on cause.   This narrow exception requires three specific showing by the party opposing conversion.   11 U.S.C. § 1112(b)(2).   Those three requirements have been stated as follows:

> [t]he Court must not convert or dismiss a case if [the debtor or other objecting party establishes that] (1) there is a reasonable likelihood that a plan will be confirmed

54

> within a reasonable time, (2) the "cause" for dismissal or
> conversion is something other than a continuing loss or
> diminution of the estate coupled with a lack of reasonable
> likelihood of rehabilitation; **and** (3) there is reasonable
> justification or excuse for a debtor's act or omission and
> the act or omission will be cured within a reasonable time.
> 11 U.S.C. § 1112(b)(2).

In re Miell, 419 B.R. at 366–67 (emphasis added).   Debtor must establish all three

to avoid conversion.

The Court finds that the evidence presented by Debtor fails to establish any of

the three requirements for the § 1112(b)(2) exception to mandatory conversion.

There is no reasonable likelihood that a plan will be confirmed within a reasonable

time in this case.   Debtor has proposed a plan which has significant deficiencies,

which are noted above.   The most important of these is that the proposed plan does

not even pay the two main lien creditors that Debtor recognizes — those holding the

rights on the Lenth and Unruh Parcels — in full.   Again, the Trustee specifically

and persuasively testified that the plan proposes to provide only for the outstanding

principal due to those creditors.   The plan does not account for the accrued interest

and/or penalties.   Neither of those creditors has indicated a willingness to take less

than the full amount of their claim — meaning the full principal balance and any

accrued interest and penalties.

55

Moreover, as noted above, there are likely additional creditors that would have to be accounted for in any successful plan. The Keeleys and Choice Financial have presented persuasive evidence that they have claims — the amount to be definitively determined later — that will need to be addressed in any plan. Because Debtor's proposed plan simply disregards claims by the Keeley's and Choice Financial as not applicable to this case, the Court finds there is no reasonable likelihood of confirmation within a reasonable time based on the plan put before this Court. To the contrary, it appears unlikely Debtor could ever confirm a plan in this case.

The second element of the § 1112(b)(2) exception is also lacking here. Under that element, the cause established for conversion must be something other than the "cause" identified in § 1112(b)(4)(A) — the continuing loss or diminution of the estate coupled with the lack of reasonable likelihood of rehabilitation. See Miell, 419 B.R. at 367. The Court has already found that movants have established "cause" under § 1112(b)(4)(A). As noted above, even under Debtor's best case scenario, Debtor's income is not sufficient to cover expenses that continue to accrue. Even the creditors that Debtor recognizes, those holding first positions on the Lenth and Unruh Parcels, are not being paid and their interest is continuing to accrue. Debtor does not currently have sufficient income to satisfy those expenses and does

56

not appear to have any immediate prospect of acquiring that income.   Even if the

sale and leaseback proposed in Debtor's plan was accomplished, it would not satisfy

the full claims with interest and penalties of the Lenth and Unruh secured claimants.

Even if it did, it does not account in any way for the claims of the Keeleys and

Choice Financial that likely will be recognized as valid claims.

Debtor has similarly failed to satisfy the third requirement necessary to

establish the exception to conversion allowed under § 1112(b)(2).   Debtor has

provided "no reasonable justification or excuse for Debtor's act or omission (that

establish cause) and that the act or omission will be cured within a reasonable time".

See Miell, 419 B.R. at 367 (citing § 1112(b)(2)).   This element requires two

separate showings.   The first is that there is a reasonable justification or excuse for

Debtor's act or omission.   As noted above, there is no excuse for Debtor's failure to

timely file schedules, statement of affairs, and other supporting preliminary

documents.   There is simply no excuse for Debtor's failure to follow Court orders

to file those documents.   As noted above, the case law does not allow Debtor to

excuse the filing of these documents as being unnecessary or a matter of form over

substance.   There are foundational documents that are absolutely required in each

bankruptcy case.   Court have specifically rejected the types of excuses Debtor

attempts to make about those documents here.

57

Even if there was a legitimate "excuse", Debtor must still show that the act or omission will be cured within a reasonable time.   See <u>Miell</u>, 419 B.R. at 367. Debtor has offered no evidence it would cure the deficiencies noted above within a reasonable time.   Debtor has presented no evidence showing how it would cure or even that it intended to cure the deficiencies.    Instead, Debtor has asked the Court to ignore the deficiencies and simply move forward.   Debtor has established a track record indicating it likely will not cure the deficiencies at all — let alone in a reasonable time.   Not even Debtor's arguments in the post-hearing brief offered to file the proper documents within a reasonable time.

Debtor has thus failed entirely to establish the § 1112(b)(2) exception to mandatory conversion that the moving parties established under § 1112(b)(1). Conversion is thus mandatory under the law and the Court has no discretion to say otherwise.

## IV.   DEBTOR'S CHAPTER 11 POLICY AND PURPOSE ARGUMENTS

A major thrust of Debtor's argument against conversion is that the Court should allow Debtor at least an opportunity to get a plan confirmed.   This argument, however, does not recognize creditors competing rights in the Chapter 11 process. Section 1112(b)(1) indicates that Chapter 11 cases can and should be converted before they move to confirmation if cause is established and there are no unusual

circumstances or statutory exceptions established.   A number of the authorities

cited above recognize that § 1112(b) can produce difficult questions for the Court to

resolve, but those questions must be resolved by the Court.   Here, the movants, led

by the Chapter 11 Trustee, have put the issue of conversion before confirmation

before the Court.   While the Court suggested during the hearing the possibility of

the Trustee preparing a competing liquidating plan, the Trustee and/or the moving

parties have chosen not to do so.   That is their legitimate choice.   They are entitled,

as they are doing here, to have the Court rule on the conversion issue.

The Chapter 11 Trustee has spent a large amount of time familiarizing himself

with Debtor's operation and the various options to best realize money for the estate

and its creditors.   The Chapter 11 Trustee has recommended conversion and

requested the Court to rule on it.   The moving parties have joined that request and

added their own persuasive arguments in favor of conversion.   The Court is left, on

the record established, with no alternative but to grant the Motion to Convert.   The

record establishes several causes for conversion — and none of the exceptions.

As the Court noted at the hearing, this particular case has produced strong

feelings on all sides of the litigation.   The Court acknowledges that Mr. Grabanski

very much wants to reorganize and continue to farm the parcels of land at issue in

this case.   The Court has concluded now that he will not be able to do so in this

Chapter 11 case.   The case will be converted to Chapter 7 and will likely result in a liquidation.   However, that is all the Court has concluded.   It has not concluded that or ruled in any way that Mr. Grabanski would be prohibited from attempting to work out a deal to lease the land from the party to which Trustee intends to sell. There may also be opportunities for Debtor and/or Mr. Grabanski to achieve other favorable terms in any ultimate sale of the property.   This will have to be accomplished as part of the Chapter 7 liquidation and not the Chapter 11 process.

CONCLUSON

For all the reasons stated above, the Court concludes that the Motion to Convert of the Chapter 11 Trustee, joined by the Keeleys and Choice Financial, to convert this case from Chapter 11 to Chapter 7 shall be granted.

**WHEREFORE**, Trustee's Motion to Convert this Chapter 11 Case to a Chapter 7 Case is GRANTED.

Dated and Entered:   October 11, 2011

_____

THAD J. COLLINS
BANKRUPTCY JUDGE
SITTING BY DESIGNATION

60