## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF NORTH DAKOTA

IN RE:       )
          ) **Chapter 7**
**KEELEY AND GRABANSKI** )
**LAND PARTNERSHIP,**   ) **Bankruptcy No. 10-31482**
          )
  **Debtor.**     )

## MEMORANDUM AND ORDER ON OBJECTIONS
## TO PROOFS OF CLAIM OF G&K FARMS (CLAIM #12)
## AND MERLYN AND DOLORES GRABANSKI (CLAIM #13)

Kip M. Kaler, the Chapter 7 Trustee, filed objections to the proofs of claim filed by G&K Farms (claim #12) and Merlyn and Dolores Grabanski (claim #13). Trustee argues both claims should be denied in their entirety. G&K Farms and Merlyn and Dolores Grabanski oppose Trustee's objections. The Court held a hearing on this matter on January 9, 2013. After careful consideration, the Court sustains Trustee's objections.

## I. FACTUAL BACKGROUND AND FINDINGS OF FACT

Debtor Keeley and Grabanski Land Partnership ("KGLP") was formed by John and Dawn Keeley and Thomas and Mari Grabanski on February 1, 2007.[1] It was formed to own and lease farm property in Texas.

On February 5, 2007, Debtor executed a promissory note for $2,340,000.00 to Eldon K. Lenth and Carol A. Lenth to purchase real property in Bowie County,

---

[1] Additional background facts relevant to the context of this case have been thoroughly discussed in other orders in this case, ECF Doc. No. 117 (Memorandum and Order filed October 11, 2011) and another related case (Thomas and Mari Grabanski dismissed, ECF Doc. No. 572). Those facts are incorporated by reference.

Texas ("Lenth Parcel").  The maturity date on the promissory note was February 1, 2018.

In 2008, Debtor purchased additional real property.  On January 4, 2008, Debtor executed a promissory note for $3,600,000.00 to Earl W. Unruh and Lenita Unruh to purchase real property located in Lamar County, Texas ("Unruh Parcel"). The promissory note stated it was due and payable in fifteen consecutive annual installments starting January 1, 2009.  The first fourteen payments were scheduled at $370,665.95, including accrued interest, and the fifteenth payment was scheduled to be the remainder of the principal owed on the promissory note plus any accrued interest.  See Exh. C.

The Grabanskis and the Keeleys also created an entity known as G&K Farms.  G&K Farms was created on January 1, 2008 for the purpose of renting and farming Debtor's farmland.  Debtor (KGLP) was not a partner of G&K Farms. Like Debtor, G&K Farms was jointly owned by the Grabanskis and the Keeleys. G&K Farms rented and farmed Debtor's Lenth and Unruh Parcels in 2008 and 2009.

## A.    Facts Related to Claim of G&K Farms

According to Thomas Grabanski, who provided the primary testimony on behalf of G&K Farms, after Debtor purchased the Lenth and Unruh Parcels, G&K Farms made changes to the parcels that increased their value.  On the Lenth Parcel,

2

it excavated ditches and installed an irrigation system.  G&K Farms offered as

evidence checks written from various accounts to cover these expenses related to

the Lenth parcel.  The numbered line describes the payee of the check and the

work it performed and the entries under the numbered line state the name of the

Grabanski or Keeley entity that paid the check, the total amout paid, and date the

checks were written, respectively:

1.     Tri State Contractors: designed and installed irrigation equipment

       -      Keeley Lamar: $24,562.75 (2/28/07)

       -      Keeley JV Lamar: $20,112.85 (10/26/07)

       -      G&K Choice: $14,365.76 (4/9/08; 5/21/08)

2.     Steve Yoder: excavated ditches

       -      G&K Choice: $101,139.50 (4/16/08; 5/14/08; 10/17/08;
              11/4/08; 11/13/08; 11/24/08; 12/8/08; 3/5/09; 3/17/09; 4/23/09;
              10/5/09)

3.     Brice Bormann: excavated wells to provide water to the irrigation
       pivots

       -      Grabanski JV Lamar: $81,122.64 (4/19/07; 6/29/08)

4.     Four State Drilling: drilled wells to provide water to the irrigation
       pivots

       -      Grabanski JV Lamar: $9,334.50 (12/29/06)

3

5.    Gateway Pipe & Supply: provided a large pipe needed to connect one side of the parcel to the other side

- G&K Choice: $9,500.00 (11/17/08)

4.    TOPO Solutions Inc.: analyzed the topography of the parcel for ditching purposes

- G&K Choice: $16,597.00 (12/8/08)

5.    Pender Water Wells/Pender Well Service: installed water pumps in the wells to provide water for the irrigation pivots

- G&K Choice: $7,278.23 (7/21/08; 7/22/08; 7/22/08)

See Exhs. G & H.  These expenses total $284,013.23.

Thomas Grabanski acknowledged that some of these checks were written from accounts not designated as "G&K Farms," but claimed these separate individual accounts functioned to fund the partnership between the Keeleys and the Grabanskis before G&K was established.  According to Grabanski, when their partnership became G&K Farms, these accounts rolled over into G&K Farms.  Thus, he stated that this shows that expenses paid by these accounts were expenses paid by G&K Farms.

G&K Farms similarly offered checks written for expenses on the Unruh Parcel.  G&K Farms asserts it incurred these expenses, for the construction of grain bins and a scale, as follows:

4

1.    Roddy Construction: excavated area used to build the bins and scale

    -    G&K Choice: $23,135.00 (3/26/08; 4/4/08; 4/21/08; 6/10/08)

2.    PBR Trucking: hauled rocks to the area used to build the bins and

    scale

    -    Grabanski JV Lamar: $3,450.21 (9/20/07)

    -    G&K Choice: $34,697.79 (1/22/08; 3/31/08; 4/4/08; 4/14/08;
        4/28/08; 5/12/08; 5/23/08)

3.    Northern Grain Equipment: built the bins and bin site

    -    G&K Choice: $373,238.00 (3/4/08; 5/5/08; 5/8/08; 6/24/08)

4.    Hart Electric: wired the scale house and bins

    -    G&K Choice: $2,383.92 (9/30/08)

5.    Earl Unruh: built the scale house

    -    G&K Choice: $9,650.00 (7/21/08)

See Exhs. G & H.  These expenses total $446,554.92.  Between the Lenth Parcel

and the Unruh Parcel, therefore, G&K Farms asserts it spent $730,568.13[2] for

expenses on behalf of Debtor.

    Additionally, Grabanski testified that Debtor and G&K Farms had an

arrangement that the entity that would be farming the Unruh Parcel each year was

---

[2] Although the individual amounts listed on Exhibit H total $730,568.15,
G&K Farms has the total listed as $730,568.13.

responsible for making the Unruh note payment for that year.  Grabanski asserts

G&K Farms made this payment in lieu of paying Debtor's rent.  Thus, G&K Farms

made the first note payment to Earl and Lenita Unruh on January 1, 2009.

After planting its crop in 2009, G&K Farms' financial status was weak.  The

Keeleys wanted to discontinue the partnership.  On September 24, 2009, the

Keeleys and the Grabanskis executed an Agreement to Assign Partnership

Interests—in both G&K Farms and KGLP from the Keeleys to the Grabanskis

effective April 30, 2009.  The Grabanskis agreed to assume all liabilities for these

entities.  The Grabanskis also agreed to stop using the G&K Farms name and to

form a new entity.

The Grabanskis eventually created that new entity, Texas Family Farms.

While the partnership assignment agreement envisioned G&K Farms ceasing to

exist, for some reason never fully described to this Court, G&K Farms has

continued to exist.

Grabanski testified that Texas Family Farms rented and farmed the Lenth

Parcel and the Unruh Parcel in 2010 in place of G&K Farms.  According to

Grabanski, Texas Family Farms thus assumed responsibility to make the note

payment to the Unruhs.  He specifically stated that Debtor (KGLP) did not make

the payments.

6

### B.  Facts Related to Claim of Merlyn and Dolores Grabanski

Texas Family Farms did not have the funds to make the 2010 note payment to the Unruhs.  Merlyn Grabanski, the father of Thomas Grabanski, made the payment instead.  Merlyn Grabanski testified that Thomas Grabanski approached him because they were short of making the Unruh payment on January 1, 2010.

Merlyn Grabanski first testified that he made the land payment to the Unruhs on behalf of Debtor, not on behalf of Thomas Grabanski or any other entity. Merlyn Grabanski then testified that he was not sure who actually made the payments and had little knowledge about the companies the Keeleys and the Grabanskis formed in Texas.  He explained that his son, Thomas Grabanski, had simply told him that the payment was needed in order to keep the land.  Merlyn Grabanski then explained he made the payment to keep his son farming.  Thomas Grabanski testified, however, that Merlyn Grabanski probably did not know the difference between Thomas Grabanski, Debtor, G&K Farms, or Texas Family Farms.

Merlyn Grabanski also stated there was never a promissory note for the payment.  It was unclear who owed him the money or who would pay him back. Additionally, he explained that the money was not a gift and that he expected repayment although terms for repayment had not been made.  He thought

7

repayment would occur in the form of real estate or perhaps after the Unruh Parcel was sold.

To make the Unruh payment, Merlyn Grabanski borrowed $380,000.00 from Choice Financial Group ("Choice") (loan no. 127037643) on February 16, 2010. See Exh. T6; Exh. A.  He pledged his own farmland as security.  On that same day, $370,655.75 was wired from Choice, in the name of Merlyn Grabanski, through Guaranty Bond Bank in Paris, Texas, for credit to Earl and Lenita Unruh.[3]  See Exh. T7; Exhs. D & E.

The wire transfer order, however, noted Tom Grabanski was the originator of the wire transfer, although it required signatures from Merlyn Grabanski and Tom Grabanski.  The wiring instructions from Guaranty Bond Bank indicated that Tom Grabanski was the sole recipient of the message.  See Exh. T7; Exh. E.  On the Credit, General Ledger, included with Exhibit D, the description provides: o/g wire - Tom Grabanski/Guaranty Bond Bank.  See Exh. D.  None of these documents suggested Tom Grabanski was acting on behalf of Debor or any other entity.

---

[3]  Although the Unruh note payment was $370,655.95, the amount wired from Merlyn Grabanski's account was $370,655.75.

Merlyn Grabanski eventually paid off the $380,000.00 he owed to Choice from this transaction.  <u>See</u> Exhs. T8, T17; Exh. F.  The $380,000.00 balance, plus accrued interest and late charges, was rolled into a new loan (loan no. 127052049) on May 16, 2011.  The new loan again was secured by Merlyn Grabanski's farmland.  <u>See</u> Exhs. T15, T16, T18.

The new loan totaled $528,000.00.  That amount included:  (1) the balance on the loan Merlyn Grabanski took to make the Unruh payment—now totaling $414,045.56 with interest and late charges included; (2) the $83,954.44 remaining from an initial $2,000,000.00 loan (no. 127036146) Merlyn had earlier taken to pay off his own operating loans, to make payment on G&K Farms' 2009 line of credit, and to pay off another loan from Choice to Thomas and Mari Grabanski; and (3) $20,000.00 covering "legal fees for D. Johnston" and $10,000.00 for additional legal fees.  <u>See</u> Exh. T4, T16.  Merlyn Grabanski paid off that $528,000.00 loan (no. 12705204) on March 27, 2012.  <u>See</u> Exh. T17.  Merlyn Grabanski explained that the funds used to repay this loan were from his farming operations and a loan from Bremer Bank.  He received no money from Thomas Grabanski or his related entities to repay any of the loans.

Merlyn Grabanski also testified that he supplied $1,350,000.00 of his earlier $2,000,000.00 loan (no. 127036146) to another entity related to Thomas

9

Grabanski.  When asked about it at trial, he, at first, stated that he thought he partially financed the operations of Texas Family Farms in 2010 with the money.  However, when asked about it a second and third time, Merlyn Grabanski said he provided the money to G&K Farms in 2009 so it could continue farming.  Loan documentation confirmed that Merlyn Grabanski made the $1,350,000.00 payment on G&K Farms' 2009 line of credit.  See Exh. T4.  Merlyn Grabanski testified that he expected repayment to occur on all these loans when the parcels were sold.  None of the amount has been repaid.

Merlyn testified that he has not loaned any of that money to Thomas Grabanski individually.  His testimony, however, is contrary to Thomas and Mari Grabanski's bankruptcy schedules.  Thomas and Mari Grabanski filed for relief under Chapter 11 of the Bankruptcy Code on July 22, 2010.  Their bankruptcy schedules were filed on September 1, 2010.  On the Grabanskis' schedule F, they list two debts to Merlyn Grabanski: one for $1,563,467.00 and another for $20,000.00.  See Exh. T20.  Moreover, the undisputed documentary evidence show that on January 19, 2010, Merlyn Grabanski paid off a loan from Choice to Thomas and Mari Grabanski individually in the amount of $269,200.00.  See Exh. T4.

## C. Debtor's Bankruptcy and Arguments About Claims

Debtor (KGLP) went into an involuntary Chapter 11 bankruptcy on December 6, 2010.  The Court entered an order for relief on January 7, 2011.  On April 1, 2011, the Court granted a motion to appoint a Chapter 11 operating trustee.  The Court appointed Kip M. Kaler as the operating trustee.  Debtor's case was converted from Chapter 11 to Chapter 7 on October 11, 2011.  Trustee Kaler remained on as the Chapter 7 trustee.[4]

On February 7, 2012, the Trustee in this case (KGLP) filed a motion to sell the Unruh Parcel.  Likewise, on March 5, 2012, the Trustee in this case (KGLP) filed a motion to sell the Lenth Parcel.  Debtor owned both parcels.  The Court granted the Trustee's motions on March 2, 2012, and March 21, 2012, respectively.

### 1.    Claim of G&K Farms and Arguments of Parties

On March 5, 2012, G&K Farms filed a proof of claim in this case for $1,069,054.61.  G&K's claim includes expenses for bins, a scale house, preparatory work for pivots, drilling and casing, electric work on pivots, and payments to Irrigation Finance.  It also includes a footnote on the attachment that reads:

---

[4] The undersigned took over this and the other Grabanski-related cases on September 15, 2011.  The Honorable William A. Hill retired August 21, 2011.

11

> The bankruptcy trustee has premised his sale of the Unruh land on an ability to sell the bins and scale house.  G&K is entitled to be paid for its property from the sale proceeds.

See Attachment to Proof of Claim, n.1.  During the hearing on its proof of claim, G&K Farms expressed its intention to amend its claim to seek only the amounts included in Exhibit H, totaling $730,568.13.[5]

G&K Farms asserts its claim should be allowed because G&K paid expenses that Debtor owed or that benefitted Debtor's land.  Thomas Grabanski testified G&K Farms and Debtor (KGLP) operated as two separate companies and filed separate tax returns.  He claims that one—G&K Farms—should be able to make a claim against the other—KGLP—and does so here.

Trustee argues, first and foremost, that all of the "contributions" G&K Farms seeks to recover were made before G&K Farms was even formed while the Keeleys were active in both partnerships.  Thus, Trustee argues the evidence, even viewed most favorably to G&K's claim here, shows that the partners chose to pay expenses of KGLP (which they owned together) from G&K Farms (which they owned together).  The Trustee argues this was simply the allocation of capital

---

[5] In G&K Farms' Post-Hearing Memorandum of Claimants, it takes the curious position to argue for only those expenses pertaining to the Unruh Parcel. The Court will assume, however, that G&K Farms is still seeking payment for expenses pertaining to the Lenth Parcel as well based upon its presentation at the hearing and the lack of a direct indication otherwise.

contributed by the partners in one entity to capital improvement made in another.
Trustee asserts that in fact and practice, however, there was no separation of the
entities. Grabanski treated them as one entity, and the money "put into" Debtor
(KGLP), was just a capital investment to the single entity. Trustee notes
shareholders are not entitled to claim reimbursement for capital contributions
unless or until all other claims are paid.

G&K disagrees. G&K in particular argues that **it** paid the expenses on
behalf of Debtor (KGLP) to add the irrigation system and to ditch and to construct
the bins and scale house. G&K Farms believes Debtor is indebted to G&K for the
amount of those expenses. G&K argues that the changes **it** made to both the Lenth
Parcel and the Unruh Parcel increased the price of each parcel when Trustee sold
them. G&K offered no valuation—either before or after the improvements—to
support this assertion.

Trustee objected to G&K Farms' proof of claim on October 18, 2012. In
support of his argument that G&K Farms and Debtor functioned as a single entity
run by Thomas Grabanski, Trustee points to balance sheets from the relevant
period of time for these entities. The balance sheets were produced in discovery in
this case, and they were prepared by Jennifer Tibert, the accountant of Thomas
Grabanski. Those documents showed that on December 31, 2008, and August 31,

2009, the assets, liabilities, and equity of G&K Farms and Debtor (KGLP) were
combined into one balance sheet.  See Exhs. T22, T23.  The balance sheet for
December 31, 2008, is captioned "G&K Farms and Land Partnership."  See Exh.
T22.  The balance sheet for August 31, 2009, is captioned only "G&K Farms," but
Debtor's (KGLP) financial information is included on that "G&K Farms" report.
See Exh. T23.

These balance sheets list fixed assets.  The list includes bins, land, land
improvements (wells dug and drainage on the Lenth Parcel), an irrigation
equipment capital lease, a scale house, **and the Lenth and the Unruh Parcels**.  Id.
G&K Farms has adamantly argued throughout this bankruptcy that it did not own
land, but its accounting documents treated it that way—indicating the lack of
distinction between the entities.  Thomas Grabanski testified that the two
companies are only merged on the balance sheets, but did not explain why and how
they were alleged to be separate for other purposes.

Each balance sheet also listed other assets, financial and commodity, held by
the entities.  On the December 31, 2008 balance sheet, which was for both entities,
the single checking account listed had $10,490.76.  The asset list also included
funds due from Gene Keeley, funds due from some employees for pre-paid
advances, and amounts due from crop insurance claims.  The assets also include

14

inventory of 2008 corn ($828,533.00) and 2008 wheat ($266,500.00).  See Exh.

T22.  As of August 31, 2009, the balance sheet for G&K Farms (which also

included Debtor's (KGLP's) assets) showed the one checking account had

diminished to $192.41.  It also showed the entity retained the 2009 corn crop

($2,200,000.00).

The asset list also specifically included funds due and owing from Grabanski

Grain ($1,635.41), MTM Farms ($1,636.17), and other entities in which Thomas

Grabanski held an interest.  See Exh. T23.  Neither balance sheet showed any debt

due or owing from Debtor to G&K Farms.  In fact, there is no inter-company debt

between G&K Farms and Debtor listed anywhere.  G&K Farms produced no

documents that even hinted at a loan or borrowing agreements with Debtor.  This

lack of documentation of any debt owing from Debtor (KGLP) to G&K is in sharp

contrast to the careful documentation of debts owing to other Grabanski entities

and relatives.

The list of liabilities from the G&K/KGLP balance sheet also includes

specific debts owing to Merlyn Grabanski ($20,000.00 in 2009), and Tom

Grabanski ($84,957.37 in 2008 and $645,751.66 in 2009).  This list of liabilities

also includes amounts owing to Choice ($5,460,000.00 in 2008 and $4,565,818.00

in 2009).  Id.  Again, this shows the merged nature of the businesses on the

15

balance sheets. The 2008 sheet purporting to be for both G&K and Debtor specifically lists money owed to Choice. Debtor (KGLP) did not owe money to Choice, but G&K Farms did. Thomas Grabanski testified that the funds received from Choice were used for operating the farm (G&K's business), not buying the land (Debtor's business). There would be no reason to have a liability to Choice Bank listed for Debtor (KGLP) unless Grabanski was treating G&K and KGLP as one entity.

Thomas Grabanski also suggested that while both the KGLP (Debtor) and G&K partnerships were set up to be owned fifty-fifty by the Keeleys and Grabanskis, (Exh. K), he is sure he put more money in the partnerships than the Keeleys. He essentially claims that most of the G&K accounts used to make the improvements to KGLP property were his money. He stated that the intent was to reimburse him or G&K separately after he received assignment of all of the partnership. Grabanski did not, however, produce checks, written agreements, or any financial documents to support these assertions.

The equity accounts for the Grabanskis and Keeleys were equal on the balance sheet. See Exhs. T22, T23. In 2008, their equity accounts were each $3,551,541.70. In 2009, they were each $51,442.97. Id. Grabanski testified that he contributed at least the amount of funds shown in his equity account in 2008.

16

He continued to insist that the funds contributed during and before the active

Keeley-Grabanski partnerships were nevertheless meant to be repaid by Debtor

(KGLP) to G&K Farms or directly to him at a later time.

Trustee received these 2008 and 2009 balance statements directly from

G&K Farms as supplemental responses to interrogatories and requests for

documents.  Thomas Grabanski signed the responses and testified that they include

the expenses for which G&K Farms seeks reimbursement.  When faced at hearing

with the readily apparent problems those balance sheets presented, Grabanski said

he did not prepare them and is not sure why they were created that way.  He

admitted, however, that Jennifer Tibert was operating under his direction.  He also

admitted he had no reason to doubt the accuracy of the documents.

In addition to the balance sheets, Trustee offered Debtor's bankruptcy

schedules, which were filed on September 23, 2011.  See Exh. T19.  Debtor

(KGLP) did not list a debt to G&K Farms.  Id.  Debtor's bankruptcy schedules

were electronically signed by Thomas Grabanski as a partner of the partnership.

Id.  When asked whether Debtor (KGLP) had any other debts at the time the

schedules were filed, Grabanski indicated it did not.  When asked at this claim

hearing why G&K Farms was not listed, Grabanski responded that he did not know

17

why.  He explained that, although he reviewed the documents before they were filed, his attorneys prepared the documents.[6]

Grabanski then explained that he considered G&K Farms differently than other creditors of Debtor (KGLP).  He stated that, in his mind, his closely related entities were considered separately from other creditors.  He did not explain how or why.  When he assembled the schedules, he stated that he only listed creditors that he knew were "coming after" Debtor for money.  He indicated his closely related entities would not be.  Yet, G&K Farms and Merlyn Grabanski are in fact coming after Debtor (KGLP) now by making their claims.

Although Thomas Grabanski admits he did not include debts from closely related entities in Debtor's bankruptcy schedules, he did include those kinds of debts in his personal bankruptcy schedules.[7]  See Exh. T20.  In particular, he included debts to Border to Border Land and Texas Family Farms, partnerships in which Thomas and Mari Grabanski held an interest, much like G&K Farms.  Id.

_____

[6] Thomas Grabanski was assisted by attorney DeWayne Johnston in the preparation of Debtor's bankruptcy schedules.  Johnston also has appeared on behalf of KGLP creditors, including G&K Farms itself.

[7] Thomas and Mari Grabanski were also assisted by attorney DeWayne Johnston in the preparation of their bankruptcy schedules.

18

**2.**    **Claim of Merlyn and Dolores Grabanski and Arguments of Parties**

Merlyn and Dolores Grabanski filed a proof of claim on March 5, 2012. Their claim is for $371,000.00.  The basis for the claim is an "equitable lien" resulting from their contribution to Debtor (KGLP) to help pay for the Texas land. During the hearing on their claim, Merlyn Grabanski stated that he is looking to recover the $370,655.75 payment he says he made to the Unruhs for that parcel of land.  He argues his claim should be allowed because the note payment moved directly from his account to the Unruhs without any intermittent control by Thomas Grabanski, and because the note payment directly benefitted Debtor (KGLP).

Trustee objected to Merlyn Grabanski's claim.  Trustee argues that Merlyn Grabanski made the note payment on behalf of Thomas Grabanski to finance the operation of the Texas Family Farm, not on behalf of Debtor (KGLP).

Like G&K Farms, Merlyn Grabanski is not listed as a creditor on Debtor's schedules.  See Exh. T19.  When Trustee asked whether Debtor owed Merlyn Grabanski money, Thomas Grabanski responded that Merlyn Grabanski made the note payment directly to Earl Unruh on behalf of Debtor (KGLP).  Thomas Grabanski insisted that he and Merlyn agreed when the Unruh property was sold, Merlyn and Dolores Grabanski would be repaid from the sale proceeds.  Thomas

19

Grabanski explained this "debt" was not listed on the schedules because neither

party had documents supporting the agreement.  Merlyn Grabanski did not offer

any documents or indicate that any existed.

Thomas Grabanski again argued that—in helping prepare the schedules for

Debtor (KGLP)—he considered Merlyn and Dolores Grabanski differently from

other creditors because they are a closely related entity.  Trustee argues Thomas

Grabanski's position is entirely without merit.  His own personal decision on how

to treat "closely related" creditors—even if true—has binding consequences in this

case and Grabanski's other cases.  Trustee pointed out that the schedules in

Thomas and Mari Grabanski's individual bankruptcy case listed debts to Merlyn

Grabanski in excess of $1.5 million.  Exh. T20.  Trustee argues that the reason

Merlyn Grabanski is asserting his claim in this case (KGLP) is because there is no

money in the Thomas and Mari Grabanski estate to collect on his claim.

Trustee argues the Grabanskis' individual bankruptcy schedules show

conclusively that everyone agreed Merlyn Grabanski made the Unruh note

payment to finance Thomas Grabanski's farming operations—not to benefit Debtor

(KGLP).  Trustee argues that all the documentary evidence in the record shows

Thomas Grabanski needed Merlyn Grabanski's financial support to continue

farming in 2010 and Merlyn loaned him—not KGLP—the money.  Thomas

Grabanski eventually all but conceded this point.

The Trustee also offered an unsigned document titled "Loan Agreement"

found in Thomas Grabanski's record produced in discovery.  <u>See</u> Exh. T21.  That

"Loan Agreement" stated in its entirety:

> Merlyn Grabanski agrees to loan to Thomas Grabanski the amount of
> $2,821,467.  Interest will accrue at 5% annually.  Interest payments
> are due annually on December 1st.  One balloon payment is due
> December 1, 2015 - principal and interest.
>
> The agreement is dated January 3, 2010.
>
> _____
>
> Merlyn Grabanski
>
> _____
>
> Thomas Grabanski

<u>See</u> Exh. T21.  Both Merlyn Grabanski and Thomas Grabanski deny seeing this

document before discovery in this case.

Counsel for G&K Farms and Merlyn Grabanski[8] eventually conceded their

claims are not really based on existing debts.  Instead, he argued payments made

by G&K Farms and Merlyn Grabanski resulted in a benefit to Debtor (KGLP).

Counsel for those entities suggested that under "equitable principles" his clients

---

[8] G&K Farms and Merlyn Grabanski were represented by a single attorney
during the hearing, attorney DeWayne Johnston.

21

should be reimbursed for that benefit.  Thomas Grabanski has not amended

Debtor's bankruptcy schedules to list either G&K Farms or Merlyn Grabanski as a

creditor of Debtor (KGLP).

## II.  CONCLUSIONS OF LAW

"A creditor or an indenture trustee may file a proof of claim."  11 U.S.C.

§ 501.  A creditor "means [an] entity that has a claim against the debtor that arose

at the time of or before the order for relief concerning the debtor ."  11 U.S.C.

§ 101(10).  To have a claim, an entity must have either of the following:

> (A)    right to payment, whether or not such right is reduced to
>        judgment, liquidated, unliquidated, fixed, contingent, matured,
>        unmatured, disputed, undisputed, legal, equitable, secured, or
>        unsecured; or
>
> (B)    right to an equitable remedy for breach of performance if such
>        breach gives rise to a right to payment, whether or not such
>        right to an equitable remedy is reduced to judgment, fixed,
>        contingent, matured, unmatured, disputed, undisputed, secured,
>        or unsecured.

11 U.S.C. § 101(5).

"The concept of a claim is broad, and it includes 'all legal obligations of the

debtor, no matter how remote or contingent . . . [that will] be dealt with in the

bankruptcy case.'"  Campbell v. Countrywide Home Loans, Inc., 545 F.3d 348, 353

(5th Cir. 2008) (quoting Egleston v. Egleston (In re Egleston), 448 F.3d 803, 812

(5th Cir. 2006)); see also Ohio v. Kovacs, 469 U.S. 274, 278–79 (1985) (finding

22

that bankruptcy claims comprise a broad category of legal obligations); <u>Peltz v. Edward C. Vancil, Inc. (In re Bridge Info. Sys., Inc.)</u>, 302 B.R. 41, 46 (Bankr. E.D. Mo. 2003) (finding that a claim under the Bankruptcy Code includes even remote and contingent legal obligations); <u>Manty v. Miller & Holmes, Inc. (In re Nation-Wide Exch. Servs., Inc.)</u>, 291 B.R. 131, 145 (Bankr. D. Minn. 2003).

"'[C]reditors' entitlements in bankruptcy arise in the first instance from the underlying substantive law creating the debtor's obligation, subject to any qualifying or contrary provisions of the Bankruptcy Code.'" <u>Reuter v. Cutcliff (In re Reuter)</u>, 686 F.3d 511, 515–16 (8th Cir. 2012) (quoting <u>Travelers Cas. and Sur. Co. of Am. v. Pac. Gas and Elec. Co.</u>, 549 U.S. 443, 450 (2007)); <u>see also</u> <u>LTV Steel Co. v. Shalala (In re Chateaugay Corp.)</u>, 53 F.3d 478, 497 (2d Cir. 1995); <u>United States v. Union Scrap Iron & Metal</u>, 123 B.R. 831, 835 (D. Minn. 1990).

"'Debt' should be read as being coextensive with the term 'claim.'" <u>U.S. Through Agr. Stabilization and Conservation Serv. v. Gerth</u>, 991 F.2d 1428, 1433 (8th Cir. 1993) (citing <u>Pennsylvania Dep't of Pub. Welfare v. Davenport</u>, 495 U.S. 552, 558 (1990)); <u>see also</u> <u>Johnson v. Home State Bank</u>, 501 U.S. 78, 84 n.4 (1991) ("'[D]ebt,' which is defined under the Code as 'liability on a claim,' 11 U.S.C. § 101(12) (1988 ed., Supp. III), has a meaning coextensive with that of

23

'claim' as defined in § 101(5).").  If a debtor is liable on a claim, it has a debt.  11

U.S.C. ' 101(12).

A properly filed proof of claim constitutes prima facie evidence of the

validity and the amount of the claim.  <u>Dove-Nation v. eCast Settlement Corp. (In re

Dove-Nation)</u>, 318 B.R. 147, 152 (B.A.P. 8th Cir. 2004); <u>In re AFY v. N. Plains

Feeders, Inc.</u>, 482 B.R. 830, 837 (D. Neb. 2012); <u>In re Cameron</u>, 452 B.R. 754, 759

(Bankr. E.D. Ark. 2011).  A proof of claim is deemed allowed unless an objection

is made.  11 U.S.C. § 502(a); <u>In re Dove-Nation</u>, 318 B.R. at 152.

Once an objection is made, the burden shifts to the objector to produce some

evidence sufficient to overcome the rebuttable presumption of validity.  <u>In re

Waterman</u>, 248 B.R. 567, 571 (B.A.P. 8th Cir. 2000); <u>In re Cameron</u>, 452 B.R. at

759.  After evidence is presented rebutting the presumption of validity of the claim,

the ultimate burden of persuasion rests on the claimant.  <u>In re Somerset Apts., Ltd</u>,

Bankr. No. 04-84197, No. 8:06CV678, 2007 WL 552209, at *7 (D. Neb. Feb. 21,

2007) (citing <u>FDIC v. Union Entities (In re Be-Mac Transp. Co.)</u>, 83 F.3d 1020,

1025 (8th Cir. 1996)).  <u>See also</u> <u>In re Muller</u> , 479 B.R. 508, 514 (Bankr. W.D.

Ark. 2012) ("[I]f the objecting party presents evidence sufficient to support the

objection to the claim, 'the ultimate burden of persuasion would have shifted to the

24

Claimant to establish its entitlement to the claims.'") (quoting In re Dove-Nation, 318 B.R. at 152).

## A.  G&K Farms' Proof of Claim

G&K Farms asserts it has a valid claim against Debtor for the expenses it incurred to add irrigation equipment and ditching to the Lenth Parcel and bins and a scale house to the Unruh Parcel.  G&K's argument is two-fold: (1) G&K Farms paid for the expenses on behalf of Debtor, creating a debt between G&K Farms and Debtor; and/or (2) G&K Farms paid the expenses which created an increase in the sale price when the parcels were sold, resulting in a benefit to Debtor (KGLP).

Neither of G&K Farms' arguments are supported by the record.  No debt exists between G&K Farms and Debtor (KGLP).  G&K Farms' counsel essentially conceded this point during the hearing.  G&K Farms offered no documents to demonstrate that it paid for the expenses on Debtor's behalf.  G&K has never even argued Debtor (KGLP) agreed to repay G&K Farms.  The documents in the record show that G&K Farms and Debtor (KGLP) operated as a single entity with no debt—or even claims—between them.

In making his objection, Trustee pointed to these deficiencies on the face of G&K's claim.  Trustee also offered affirmative evidence further showing the lack of merit in the claims.  Trustee offered balance sheets from 2008 and 2009

produced in discovery by G&K.  The balance sheet from December 31, 2008, is for both "G&K Farms and Land Partnership."  See Exh. T.22.  It lists the fixed assets of both G&K Farms and Debtor (KGLP).  It specifically lists the Lenth Parcel and the Unruh Parcel on this joint statement.  That same list includes bins, equipment, land improvements, and the scale house. Id.

The December 2008 balance sheet includes the liabilities of both G&K Farms and Debtor (KGLP).  Id.  These liabilities do not include an inter-company debt or claims between G&K Farms and Debtor, let alone any specific debts for the irrigation equipment, ditching, bins, or the scale house.  Id.

The balance sheet from August 31, 2009, is captioned only for "G&K Farms," but nonetheless again includes Debtor's financial information.  See Exh. T23.  It lists the same fixed assets, including the two land parcels.  It again includes the bins, equipment, land improvements, and scale house as being owned together with—not separate from—Debtor (KGLP).  Id.  The 2009 assets added an irrigation equipment capital lease to the list.  Id.

The 2009 balance sheet included (without distinction) the liabilities for both G&K Farms and Debtor (KGLP).  Id.  It again does not include any inter-company debt between G&K Farms and Debtor.  Id.

26

Trustee points out this failure to list any obligation from Debtor to G&K Farms is revealing. Amounts owed from other Grabanski entities to G&K and Debtor are carefully noted as assets. The 2009 asset list includes debts due and owing (totaling $3,271.58) from Grabanski Grain and MTM Farms. Id. Amounts G&K Farms/Debtor owed to other Grabanski-related persons and entities are also carefully noted as liabilities. The 2008 liabilities list shows $84,957.37 owed by the entities to Thomas Grabanski. The 2009 liabilities list shows G&K owed $20,000.00 to Merlyn Grabanski and $645,751.66 to Thomas Grabanski. This demonstrates to the Court that if the $730,568.13 debt between G&K Farms and Debtor (KGLP) actually existed it would have been included in the balance sheet just like the other Grabanski-related entities and people.

Trustee also points out Debtor's bankruptcy schedules do not list G&K Farms as a creditor. Thomas Grabanski, as a partner of Debtor (KGLP), signed Debtor's bankruptcy schedules attesting to their accuracy. As a partner in G&K Farms, coupled with the level of his involvement, he would have had firsthand knowledge at that time whether a debt between Debtor and G&K Farms existed. It is evident from the record the debt did not exist.

Thomas Grabanski cannot escape the facts by now placing the blame on his attorney for failure to list the alleged debt. See Wescott Agri-Prod., Inc. v. Sterling

27

State Bank, Inc., 682 F.3d 1091, 1095–96 (8th Cir. 2012) (finding that it is not unjust to hold a client responsible for his attorney's misconduct because the client voluntarily chooses his attorney as his representative and cannot avoid the consequences of the acts or omissions of a freely selected agent). Grabanski reviewed the schedules and signed them before they were filed.

In Thomas and Mari's personal bankruptcy, they listed as assets several partnership interests including Border to Border Land, Grabanski Grain, Texas Family Farms, G&K Farms, and KGLP. They also listed an account receivable from G&K Farms of $163,428.65. The Grabanskis' schedules also listed liabilities to several of their related entities including: Border to Border Land ($68,235.19); Merlyn Grabanski ($1,563,467.00 and $20,000.00); and Texas Family Farms ($232,434.63). In simplest terms, this shows that they knew how to list and, in fact, did list obligations to and from other entities they owned when those obligations really existed.

All of this shows the alleged obligation of this Debtor (same ownership and attorney) to G&K (same ownership and attorney) did not really exist and was only belatedly asserted to try to recapture money from the one entity—Debtor (KGLP) that had real assets. In spite of Grabanski's assertions that G&K Farms is not a partner of Debtor (KGLP) and his testimony that G&K Farms and Debtor operated

28

as separate entities, they were not in fact operated as separate entities during the relevant time.  To the contrary, they were extremely intertwined.  See Exhs. T22, T23.  They functioned as one pool of assets and liabilities and the money came from equity capital contributions of the partners—not from one separate entity to the other.

While the balance sheets prove this quite conclusively, the undisputed timeline of events and operations makes this more clear.  G&K Farms was created on January 1, 2008, for the purpose of renting farmland held by Debtor.  As a result, G&K Farms would have generated virtually no income until its crops were harvested and sold in late 2008.  The vast majority of expenses G&K Farms now claims that it paid for Debtor (KGLP) came from 2006, 2007 and 2008—before G&K had its own money (if it ever did).

The December 2008 balance sheet basically documents this fact.  It is captioned as a joint company—"G&K Farms and Land Partnership."  As inventory, the joint operation held $828,533.00 in 2008 corn and $266,500.00 in 2008 wheat in December 2008.  See Exh. T22.

Because G&K Farms still held its 2008 crops as inventory on December 21, 2008, G&K's revenue had yet to be earned.  As a result, the money provided to pay for the irrigation equipment, ditching, bins, and scale house on Debtor's (KGLP)

29

property could not have come from G&K because it did not have that money yet. The money had to come from some other source. The documentation in the record makes it clear that this money came from the partner's equity contributions in the joint operation. In December 2008, the equity accounts for John and Dawn Keeley and Tom and Mari Grabanski each held $3,551,541.70 for a total of $7,103,083.40. Id. Thomas Grabanski testified that he contributed at least the amount reflected in his equity account to the partnerships. The only source of funds available for these land improvement expenses, therefore, was the contributions by the Keeleys and the Grabanskis as capital contributions by equity partners.

The balance sheet for the joint entities on December 31, 2008 shows the Grabanskis and Keeleys had made equal capital contributions of $3,551,541.70. Those capital contributions appear to be the source of $730,565.17 in land improvements. While the balance sheet shows a loan of $84,957.37 from Tom Grabanski to the joint entity, that would only have covered a small portion of the expenses. More importantly, Thomas Grabanski was asked about this loan and never claimed the funds were used for the expenses G&K is trying to recover— which further points to the fact Tom Grabanski is not making the claim here— G&K is.

Trustee met his burden of showing the deficiencies in G&K's claim.  G&K failed to prove its entitlement to a claim.  The overwhelming record evidence shows Debtor (KGLP) does not owe a debt to G&K Farms.

Although there is no debt owed, G&K Farms argues it still has a claim against Debtor because Debtor received a benefit when the Lenth and Unruh Parcels were sold.  G&K Farms contends that the changes it made resulted in an increased price of sale, benefitting Debtor.  The Court rejects this argument for lack of proof.  G&K Farms failed to introduce evidence that an increase in the sale price of either the Lenth Parcel or the Unruh Parcel resulted from the changes that were made.

Even if the Court was to consider the substance of that argument, the basic premise is flawed.  Although someone may receive a benefit from the expenditure of money, a legal obligation or a right to payment is not necessarily created.  Claims arise under substantive law.  See Reuter v. Cutcliff (In re Reuter), 686 F.3d 511, 515–16 (8th Cir. 2012); see also LTV Steel Co. v. Shalala (In re Chateaugay Corp.), 53 F.3d 478, 497 (2d Cir. 1995); United States v. Union Scrap Iron & Metal, 123 B.R. 831, 835 (D. Minn. 1990).  A debt or a claim cannot arise where the debtor is not liable for repayment.  See 11 U.S.C. § 101(5); see also Eisen v. Thompson, 370 B.R. 762, 770 (N.D. Ohio 2007) (citing In re Villarie, 648 F.2d

31

810 (2d Cir. 1981)); <u>McVay v. Otero</u>, 371 B.R. 190, 196 (W.D. Tex. 2007).  The Court has found no case law supporting the proposition that merely receiving a benefit creates a claim, and G&K Farms has not directed the Court to any.

The simple fact remains that the expenses at issue were paid in 2006, 2007, 2008, and 2009, and the parcels were not sold until 2012.  G&K Farms offered no persuasive evidence of valuation at all, let alone that the expenses G&K allegedly paid resulted in a dollar-for-dollar increase in the sale price.  G&K Farms has not sustained its burden demonstrating that it is entitled to a claim in Debtor's case.

## B.    **Merlyn and Dolores Grabanski's Proof of Claim**

Merlyn and Dolores Grabanski offer arguments similar to those of G&K Farms.  Their argument is two-fold as well: (1) Merlyn Grabanski made the note payment to the Unruhs on behalf of Debtor, creating a debt between Merlyn Grabanski and Debtor; and/or (2) Merlyn Grabanski made the note payment to the Unruhs and Debtor benefitted as a result.

Merlyn Grabanski's claim suffers from shortcomings similar to those of G&K Farms.  First, Debtor does not owe a debt to Merlyn Grabanski.  Merlyn Grabanski presented no documentation showing he made the note payment on behalf of Debtor.  Thomas Grabanski also conceded that no such document

existed.  Although Merlyn Grabanski testified that he made the payment for

Debtor, other, more persuasive testimony and evidence indicated he did not.

Merlyn Grabanski's testimony was inconsistent.  Although he testified he

acted on behalf of Debtor, he also testified that Thomas Grabanski solicited the

payment, that he had little knowledge about how the Keeley-Grabanski entities

functioned, that he did not know who was responsible for the note payment, and

that he did not know who would repay him or how it would be done.  Thomas

Grabanski testified that it was doubtful that Merlyn Grabanski knew the difference

between Thomas Grabanski, G&K Farms, and Debtor.

While Thomas Grabanski also stated that the note payment Merlyn made

was made on behalf of Debtor, evidence submitted by both parties indicates

otherwise.  Both the wire transfer order and the wiring instructions from Guaranty

Bond Bank in Paris, Texas, indicate that Thomas Grabanski was directly involved

with the wire transfer.  Neither the transfer order or instructions designated Tom

Grabanski as an agent of any entity while doing so.  See Exhs. T7; Exh. E.  The

Credit, General Ledger, included with the transfer, provides the following

description:  "o/g wire - Tom Grabanski/Guaranty Bond Bank."  See Exh. D.  The

money was sent to Thomas Grabanski to help him stay in the farming business in

Texas.  It was not designated for KGLP to pay its obligatons.

33

Merlyn Grabanski specifically testified that he made the note payment so that Thomas Grabanski could keep farming.  Thomas Grabanski was farming the Unruh Parcel in 2010 through Texas Family Farms.  Texas Family Farms, he agreed, was therefore the entity responsible for making the note payment.  He specifically stated that Debtor was not responsible for the note payment.  The evidence shows Merlyn Grabanski made the note payment on behalf of Thomas Grabanski or Texas Family Farms or both, but not Debtor.

Although Merlyn Grabanski testified that he has never loaned any money to Thomas Grabanski, the Court finds this testimony not to be credible.  On the individual bankruptcy schedules of Thomas and Mari Grabanski, Merlyn Grabanski is listed as a creditor who has two claims in excess of $1.5 million.  See Exh. T20.  Debtor's schedules have also never been amended to add Merlyn Grabanski as a creditor of Debtor.  Debtor does not owe a debt to Merlyn Grabanski.

Merlyn Grabanski argues, however, that his claim should still be allowed because Debtor received a benefit when he made the payment.  Again, the Court has found no case law supporting this proposition and Merlyn Grabanski has offered none.  Accordingly, Merlyn Grabanski has not demonstrated that he is entitled to a claim in Debtor's case.

34

Thus, the Court has concluded that neither G&K Farms nor Merlyn and Dolores Grabanski made Debtor, KGLP, a loan such that they have an allowable claim. However, even if the Court were to decide that any payments from G&K Farms and Merlyn and Dolores Grabanski were properly characterized as loans, the Court would still deny such claims. Under § 502(1), the Court must deny claims "to the extent that—(1) such claim is unenforceable against the debtor and property of the debtor, under any agreement or applicable law for a reason other than because such claim is contingent or unmatured . . . ." 11 U.S.C. § 502(b)(1). A significant portion of the evidence, presented at the hearing and summarized above, showed that there were no written agreements or documentation for any of these transactions. At the hearing, Trustee effectively raised the question about whether such transactions were enforceable without a writing.

North Dakota's version of the statue of frauds requires that "[a]n agreement or promise for lending of money or the extension of credit in an aggregate amount of twenty-five thousand dollars or greater" be in writing in order to be enforceable. N.D.C.C. § 9–06–04(4); see also Smestad v. Harris, 796 N.W.2d 662, 665–66 (N.D. 2011) (discussing the North Dakota statute of frauds). Because the aggregate amount of each party's loan would exceed the limit, the Court finds that neither loan would be enforceable under applicable law. As such, even if the Court

35

did consider the claims filed by G&K Farms and Merlyn and Dolores Grabanski to be loans, the Court would deny such claims under § 502(b)(1).

The Court therefore concludes that the Trustee's objection to the proof of claim of G&K Farms is SUSTAINED.  The Trustee's objection to the proof of claim of Merlyn and Dolores Grabanski is also SUSTAINED.  The proofs of claim of G&K Farms and Merlyn and Dolores Grabanski are therefore DISALLOWED.

The Court has considered all other arguments and deems them to be without merit.

**SO ORDERED.**

Dated this 30th day of May, 2013.

**THAD COLLINS
U.S. BANKRUPTCY JUDGE
SITTING BY DESIGNATION**

36