UNITED STATES BANKRUPTCY COURT
DISTRICT OF NORTH DAKOTA

In re:                                            Bankruptcy No. 10-31482
                                                  Chapter 7
Keeley and Grabanski Land Partnership,

                         Debtor.
_____/

## MEMORANDUM AND ORDER

John and Dawn Keeley filed a motion under 11 U.S.C. § 503(b)(3) and (4) for
the allowance and payment of administrative fees and expenses they incurred related
to this case.   Kip Kaler, the bankruptcy trustee for Debtor Keeley and Grabanski
Land Partnership (KGLP), filed an objection to the motion.   Louie Slominski, Jr., a
creditor and interested party, also filed an objection.   For the reasons that follow,
the Court grants in part and denies in part, the Keeleys' claim for administrative
expenses.

## I.   Factual Background[1]

KGLP is a North Dakota partnership formed in 2007 that originally had four
partners - John and Dawn Keeley and Thomas and Mari Grabanski.   KGLP

_____

[1] Additional background facts relevant to the context of this case have been
thoroughly discussed in other orders in this case, ECF Doc. No. 117 (Memorandum
and Order filed October 11, 2011) and another related case, Thomas and Mari
Grabanski, Order Dismissing Case, ECF Doc. No. 572.   Those facts are
incorporated by reference.

purchased several tracts of farmland, including two large tracts in Texas.   Those

two tracts have been referred to in these proceedings as the "Lenth Parcel" and the

"Unruh Parcel."   Both tracts were subject to seller-financed mortgages.

In 2009, the Keeleys assigned their partnership interest in KGLP and other

Keeley/Grabanski partnerships to the Grabanskis.   As part of that assignment, the

Grabanskis agreed to satisfy all partnership debts upon the Keeleys transfer of their

ownership interest to the Grabanskis.   In spite of this agreement, however, several

creditors sued the Keeleys to recover debts owed by the partnerships because the

Grabanskis have not paid the creditors as promised.   The Keeleys claim a right of

indemnification from KGLP and/or the Grabanskis for any partnership debts the

Keeleys are required to pay.

The Grabanskis filed a voluntary Chapter 11 petition on July 22, 2010.   The

Keeleys retained Kennelly & O'Keeffe to deal with matters related to their personal

liability for partnership debts in light of the Grabanskis' personal bankruptcy.   ECF

Docket No. 280.

On October 11, 2010, the Lenths (owner of the Lenth parcel) sent a notice of

acceleration and demand to KGLP because the Lenths were not being paid by

KGLP, the Grabanskis, or anyone else.   The notice stated, among other things, that

in the event of foreclosure sale resulting in insufficient funds to satisfy all sums due

and owing to the Lenths, the borrowers and guarantors would be jointly and

severally liable.   The Lenth Parcel was scheduled for foreclosure sale on December 7, 2010.

According to the Keeleys, their attorneys (Kennelly & O'Keeffe) engaged in substantial investigation into the activities of KGLP and the Grabanskis prior to the foreclosure sale date.   In particular, the Keeleys assert their lawyers investigated: (i) the Grabanski and KGLP farming operations in Texas; (ii) the Grabanskis' intentions, if any, to pay KGLP's debts to the first lienholders; and (iii) the Grabanskis' intentions, if any, to prevent foreclosure by the Lenths.   ECF Docket No. 280.   After gathering that information, the Keeleys and their attorneys decided to retain the Larkin Hoffman law firm to provide general bankruptcy counsel to Kennelly & O'Keeffe and to prepare an involuntary petition against KGLP.

The Keeleys, through their two law firms, filed an involuntary Chapter 11 bankruptcy petition against KGLP on December 6, 2010.   This filing stayed the foreclosure sale on the Lenth Parcel.   The Keeleys filed amended schedules and statements on December 16, 2010.   The Court entered an Order for Relief on January 7, 2011.

On January 10, 2011, KGLP appeared through counsel and moved to dismiss the case.   KGLP asserted, among other things, that the Keeleys were no longer partners in KGLP and that any claim the Keeleys could assert against KGLP would

be subject to bona fide dispute as to liability or amount.   The Keeleys opposed

dismissal.   On July 8, 2011, the Court denied KGLP's Motion to Dismiss.   The

Court concluded that any issues KGLP wanted to raise regarding the merits of the

involuntary petition should have and could only have been done by filing a timely

answer or responsive motion before the Order for Relief.

On February 3, 2011, the Keeleys moved for the appointment of a Chapter 11

operating trustee.   They alleged the Grabanskis fraudulently transferred assets out

of the KGLP partnership and allowed KGLP to incur additional debt solely for the

Grabanskis' personal benefit.   The Keeleys also pointed out that several creditors in

the Grabanskis' personal bankruptcy case had accused Thomas Grabanski of fraud.

KGLP opposed the appointment of a trustee.   Following hearing, the Court denied

the motion but expressly authorized the Keeleys to renew the motion at a later time.

The Keeleys filed a renewed motion to appoint a Chapter 11 operating trustee

on March 22, 2011.   This time, in addition to the allegations of fraud and

misconduct cited previously, the Keeleys asserted that the Grabanskis' improper

actions related to an offer to purchase KGLP's land necessitated the appointment of

a trustee.   The United States Trustee joined in the Keeley's motion arguing the

Grabanskis were unduly delaying the administration of KGLP's estate.   Other

KGLP creditors, Choice Financial and the Unruhs, also joined the motion.

The Court found cause to appoint an operating trustee on April 1, 2011.[2]  The Court appointed Kip Kaler, an experienced panel trustee and bankruptcy attorney, as the Chapter 11 trustee.   Kaler immediately investigated the viability of KGLP and its ability to reorganize.   After making that investigation Kaler filed a motion to convert the case from Chapter 11 to Chapter 7.   The Court held an evidentiary hearing on the matter in Fargo. [3]   In a 60 page order, the Court granted the motion on October 11, 2011.

The Keeleys continued their involvement with proceedings in the case even after conversion.   The Keeleys appeared personally and through counsel in the majority of the enormous number of proceedings in the KGLP bankruptcy, the associated adversaries filed by Kaler, and the Grabanskis' personal bankruptcy case and adversaries.

The Keeleys now seek approval of the fees and expenses they incurred to their lawyers at Kennelly & O'Keeffe and Larkin Hoffman, in the total amount of $167,103.10, as administrative expenses under 11 U.S.C. §§ 503(b)(3) and (4). The Keeleys submitted 30 pages of timesheets from Kennelly & O'Keeffe and

---

[2]  KGLP appealed, and the Bankruptcy Appellate Panel for the Eighth Circuit affirmed.

[3] The undersigned took over this case at the time of this hearing.   The Honorable William Hill presided over the case until his retirement a short time before the hearing.

Larkin Hoffman in support of their motion.   Trustee and Creditor Louie Slominski, Jr. object to this request.

## II.   Conclusions of Law

An administrative expense allowed under § 503(b) entitles the holder to priority in distribution.   <u>See</u> 11 U.S.C. § 507(a)(2).   Because the allowance of administrative expense claims often diminishes the recovery of other creditors and claimants, § 503(b) is narrowly construed.   <u>AgriProcessors, Inc. v. Iowa Quality Beef Supply Network, L.L.C. (In re Tama Beef Packing, Inc.</u>), 290 B.R. 90, 96 (B.A.P. 8th Cir. 2003).   Applicants under § 503(b) have the burden of establishing their entitlement to an award by a preponderance of the evidence.   <u>In re Hanson Industries, Inc.</u>, 90 B.R. 405, 409 (Bankr. D. Minn. 1988).   As with all fee applications in bankruptcy cases, the applications must be supported by detailed time sheets.   <u>Id.</u> at 409-10.

Section 503(b) provides, in relevant part:

> (b) After notice and a hearing, there shall be allowed, administrative expenses, other than claims allowed under section 502(f) of this title, including -
>
> * * *
>
> (3) the actual, necessary expenses, other than compensation and reimbursement specified in paragraph (4) of this subsection, incurred by -

(A) a **creditor that files a petition under section 303** of this title;

\* \* \*

(D) a creditor, . . . in making a **substantial contribution** in a case under chapter 9 or 11 of this title;

\* \* \*

(4) reasonable compensation for professional services rendered by an attorney or an accountant of an entity whose expense is allowable under subparagraph (A), (B), (C), (D), or (E) of paragraph (3) of this subsection, based on the time, the nature, the extent, and the value of such services, and the cost of comparable services other than in a case under this title, and reimbursement for **actual, necessary expenses incurred by such attorney** or accountant.

11 U.S.C. § 503(b) (emphasis added).   The Keeleys seek reimbursement under § 503(b)(4) of the legal fees they incurred in: (A) filing the involuntary petition (§ 503(b)(3)(A)); and (B) substantially contributing to the case (§ 503(b)(3)(D)).

## A.    Involuntary Petition

The purpose of allowing petitioning creditors their attorneys' fees and costs is to encourage them to successfully bring the debtor into court so that there may be an equitable marshaling and distribution of assets before debtor squanders them.   In re Hanson Industries, Inc., 90 B.R. at 410.   Petitioning creditors may seek the fees and costs directly related to preparing the involuntary petition and pursuing it to successful conclusion by entry of the order for relief.   Id.; see In re Key Auto

7

Liquidation Ctr., Inc., 384 B.R. 599, 606-07 (Bankr. N.D. Fla. 2008) (finding

attorneys' fees and costs may be recovered under §§ 503(b)(3)(A) and (b)(4) for

preparing and filing the involuntary petition, contacting other creditors to join in the

petition, performing legal and factual research on the grounds for filing the case, and

litigating whether an order for relief should be entered).   The fees are subject to a

reasonableness review mirroring that of § 330.   In re Key Auto Liquidation Ctr.,

Inc., 384 B.R. at 606 (citing In re Stoecker, 128 B.R. 205, 209 (Bankr. N.D. Ill.

1991)).

The Keeleys allege that they incurred $54,401.00 in attorney fees and costs

related to the investigation, preparation, filing, and adjudication of the involuntary

petition, as well as preparing amended schedules. They allege they incurred

$35,322.50 to Kennelly & O'Keeffe and $19,078.50 to Larkin Hoffman for these

same activities.

The Keeleys assert the run up to the foreclosure date and eventual involuntary

filing "required substantial coordination between the firms, with numerous meetings

and conferences required to effectively communicate the situation and prepare the

petition."   ECF Docket No. 280 at ¶ 8.

Trustee Kaler asserts that the billing statements from both Kennelly &

O'Keeffe and Larkin Hoffman contain charges—not just with regard to the petition,

but generally—that are inappropriate to recoup from the estate or that require

substantial further explanation.   Kaler explained at the hearing that the Keeleys

were helpful to him but did not provide any unique assistance.   Moreover, he

pointed out he would have worked directly with the Keeleys to gather information

from them had they not been represented.   In other words, the representation did not

make a substantial contribution to his work.

When asked at the hearing whether $54,401.00 in fees related to its

investigation and preparation of the involuntary petition was excessive, the Keeleys

argued the fees were:

> "warranted in this case when you consider what was going on at the
> time with the Keeleys not having access to information regarding debts
> that they were being held personally liable to.   You also have to
> consider that we were operating out of North Dakota trying to
> investigate what was going on in Texas.   And then there are also fees
> for coordinating between Kennelly & O'Keeffe and the Larkin
> Hoffman law firm to essentially take advantage of their great expertise
> in bankruptcy to prepare the involuntary petition."

Hearing on Application for Administrative Expenses, June 4, 2012.   The Court is

not persuaded by this argument.

### 1.  Larkin Hoffman Fees

The Larkin Hoffman entries allegedly related to the involuntary petition are

from August 27, 2010, through December 16, 2010.   The beginning date of August

27, 2010, was more than three months before the filing of the Chapter 11 petition on

9

December 6, 2010.   The time entries show that the work Larkin Hoffman

performed in those first few months related to the Grabanskis' personal bankruptcy

filed on July 22, 2010.   As such, all fees from August 27, 2010, to November 26,

2010, are disallowed.   See In re Hanson Indus., Inc., 90 B.R. at 412 (disallowing

fees incurred prior to April 9, 1987, and April 22, 1987, for two law firms that

worked on an involuntary petition filed on May 1, 1987, as being too "temporally

remote to the actual filing of the petition, even though those activities tangentially

benefitted the estate").

The first Larkin Hoffman entry with any relation to the KGLP bankruptcy

case is from December 1, 2010:

> 12/1/10      Analysis of documents in file; conference with ND
> attorneys regarding possible involuntary bankruptcy; Job
> One is to stop the foreclosure on the property of the
> general partnership

This entry was billed by "KCE" at a rate of $375/hour for a total amount of $562.50.[4]

The next two entries also relate to the involuntary petition:

---

[4] Using this first entry as an example, the Court will subsequently denote the
timekeeper, hourly rate, total charge and time spent for each entry in this format:
KCE/$375/$562.50/1.5.   The time sheets of neither Larkin Hoffman nor Kennelly
& O'Keeffe indicate the amount of time spent on each entry.   Rather, to determine
the amount of time for each entry, the Court has divided the total amount billed by
the listed hourly rate.

| 12/6/10 | Preparation of documents and supervise filing of involuntary bankruptcy; conference with clients and local counsel (KCE/$375/$2,250.00/6.0) |
|---|---|
| 12/6/10 | Work with Ken Corey-Edstrom regarding involuntary petition; consult and email with John and Dawn Keeley, consult with Jack Dwyer, attorney; request information, prepare documents; review and locate creditors; consult with North Dakota clerk regarding filing; obtain signatures, file with court, obtain wire transfer instructions, set up (BHP/$190/$817.00/4.3) |

While the Court will approve all of these fees, it should be noted that all three of

these entries suffer from "lumping."   Lumping two or more separate and unrelated

activities in one billing entry is not permitted.   In re Racing Services, Inc., 2008 WL

822231, at *8 (Bankr. D.N.D. Mar. 26, 2008).

> Lumping destroys a court's ability to review counsel's work for reasonableness. Kelsey v. Great Lakes Higher Educ. Corp. (In re Kelsey), 272 B.R. 830, 834 (Bankr. D. Vt. 2002); In re NWFX, Inc., 267 B.R. 118, 230 (Bankr. W.D. Ark. 2001). It is a practice universally disapproved of by bankruptcy courts for two reasons.   First, it permits an applicant to claim compensation for rather minor tasks which, if reported individually, would not be compensable.   Second, it prevents the court from determining whether individual tasks were expeditiously performed within a reasonable period of time because it is impossible to separate into components the services which have been lumped together. In re Southern Diesel, Inc., 309 B.R. 810, 817 [(Bankr. M.D. Ala. 2004)]; In re Recycling Indus., Inc., 243 B.R. 396, 406 (Bankr. D. Colo. 2000).

In re Racing Services, Inc., 2008 WL 822231, at *8.

The lumped work performed in these three entries, however, all relates to filing the involuntary petition.   The total amount for these three entries is $3,629.50.   The Court will approve that amount as reasonable and directly related to the preparation of the involuntary petition or necessary legal and factual research on the grounds for filing the case.   See In re Rodakis, 2009 WL 1069164, at *6 (Bankr. D. Ariz. Mar. 30, 2009) (finding $1,050.00—or 3.5 hours at $300 per hour—an allowable administrative expense for filing an involuntary Chapter 11).

There are several later entries that reference work related to amending the petition.   These entries are also lumped and do not demonstrate on their face that all of that work was needed for amending.   The Court will allow a total of $500.00 for work on the amended petition.   The remainder of the Larkin Hoffman fees, sought by the Keeleys through the filing of the amended petition on December 16, 2010, is disallowed as unnecessary or not related directly to the preparation of the involuntary petition.

In total the Court approves an amount of $4,129.50 to be recovered from the estate for Larkin Hoffman Fees incurred during activities associated with filing and amending the involuntary petition.[5]

---

[5] The Court reaches the $4,129.50 total through addition of the $3,629.50 in allowable fees for work stated in the Dec. 1, 2010, and Dec. 6, 2010, time entries,

12

### 2. Kennelly & O'Keeffe Fees

The Kennelly & O'Keeffe entries allegedly related to the involuntary petition
run from October 21, 2010, through December 15, 2010.   They total $35,322.50.
However, much of that, like much of the work of Larkin Hoffman, did not relate to
this bankruptcy case.   Instead, the work it primarily related to the Keeleys' own
personal interests or to matters in the Grabanskis' bankruptcy case.   For example,
the first entry states:

> 10/21/10   Research whether permission is needed from the bkcy
> court for an individual in bkcy to sell land of a partnership
> not in bkcy; draft joinder to motion to lift automatic stay
> (SM/$125/$375.00/3.0)

This entry on its face relates only to the individual Grabanski bankruptcy case, and
most of the other entries during this timeframe do as well.   Another example is
Kennelly & O'Keeffe's billing for preparation and attendance of the depositions of
Thomas Grabanski and his accountant in the Grabanskis' personal bankruptcy.
These and many of the other fees were incurred for the Keeleys' benefit not
KGLP's.

The Court further notes that entries during this six-week timeframe before
filing the involuntary bankruptcy include at least twenty-nine references to
communications (telephone, e-mail, or meetings) with the Keeleys.   Many of these

_____

and $500.00 for work on the amended petition.

communications are lumped with other tasks and do not provide a description of the subject of the communications.[6]   The Court recognizes the critical need for counsel to communicate fully and regularly with clients.   However, almost daily communications coupled with the complete failure to describe the subject matter—in particular to show it all related to the **involuntary filing** and not Keeley specific issues—renders them largely non-compensable under the application standards.

Nevertheless, the Court recognizes Kennelly & O'Keeffe did do work that was important to the background of the involuntary case.   The Court concludes the Keeleys may recover $2,000.00 of the Kennelly & O'Keeffe attorneys' fees from the KGLP bankruptcy estate.   The Keeleys also may recover the $1,039 fee for filing the petition.   These amounts total $3,039.00 in recoverable fees.

The remaining attorney fees claimed by the Keeleys claimed to relate to the involuntary petition are disallowed.   In making this determination the Court notes that Kennelly & O'Keeffe expressly sought expertise from Larkin Hoffman to formulate the involuntary bankruptcy petition and its filing.   It is hard for the Court to find that Kennelly & O'Keeffe should receive more compensation from the estate

---

[6] Kennelly & O'Keeffe's billing entries lack specificity throughout, not just with regard to communications.

14

for involuntary bankruptcy assistance than the expert firm it hired to actually

conduct the work.

**B.    Legal Fees Incurred by the Keeleys After the Involuntary Petition but Before Trustee Kaler's Appointment**

A creditor is entitled to reimbursement for "making a substantial

contribution" to a Chapter 11 case.    11 U.S.C. § 503(b)(3)(D) and (b)(4).    The

proper administration of a Chapter 11 case rarely contemplates individual creditors

contributing to the case.    In re Bayou Grp., LLC, 431 B.R. 549, 561 (Bankr.

S.D.N.Y. 2010).    Normally, it is the role of professionals retained under §§ 327 and

328 of the Bankruptcy Code, and ultimately of the court, to ensure that Chapter 11

cases proceed properly and efficiently.    Id.    Third parties, who generally represent

only their clients' interests and only indirectly contribute to the case's

administration, therefore are not usually compensated by the estate on an

administrative priority basis.    Id.    "Instead, 'compensation under § 503 is reserved

for those **rare and extraordinary circumstances** when the creditor's involvement

truly enhances the administration of the estate.'"    Id. (quoting In re Dana Corp., 390

B.R. 100, 108 (Bankr. S.D.N.Y. 2008) (emphasis added)).

"The appropriate test under Section 503(b) is whether the services

substantially contributed to a successful result, that is, an actual and demonstrable

15

benefit to the debtor's estate, the creditors, and to the extent relevant, the stockholders."   Manufacturers Hanover Trust Co. v. Bartsh (In re Flight Transp. Corp. Sec. Litig.), 874 F.2d 576, 582 (8th Cir. 1989).   "The integrity of section 503(b) can only be maintained by strictly limiting compensation to extraordinary creditor actions which lead directly to tangible benefits to the creditors, debtor or estate."   In re Best Prods. Co., Inc., 173 B.R. 862, 866 (Bankr. S.D.N.Y. 1994); see In re American Plumbing & Mech., Inc., 327 B.R. 273, 280 (Bankr. W.D. Tex. 2005) (citing cases requiring a "significant and tangible benefit," a "concrete benefit," a "direct, significant and demonstrably positive benefit," and a contribution that is "considerable in amount, value or worth").

A direct benefit cannot be established merely by the movant's extensive participation in the case or be based on services that duplicated those of professionals already compensated by the estate.   In re Bayou Grp., LLC, 431 B.R. at 561.   Further, creditors face an especially difficult burden in passing the "substantial contribution" test because they are presumed to act primarily for their own interests.   Id.   Efforts undertaken by creditors primarily to further their own interests are not compensable under § 503(b) even if they also confer an indirect benefit on the estate.   Id.; see In re Lease-A-Fleet, Inc., 148 B.R. 419, 427 (Bankr.

16

E.D. Pa. 1992) (finding that a movant acting in its own self-interest is precluded from recovery as an administrative expense).

The Keeleys assert they were instrumental in moving the bankruptcy forward toward its ultimate resolution which allowed creditors to recover far more than they could have reasonably expected in December 2010.   Specifically, the Keeleys point out that they successfully objected to a motion to dismiss the case by KGLP and successfully moved the Court to appoint an operating trustee.   The Keeleys suggest they acted in a leadership role during this period and substantially contributed to the case.   They incurred $22,833.50 to Kennelly & O'Keeffe and $60,809.04 to Larkin Hoffman for a total of $83,642.54 after filing and through appointment of an operating trustee.

### 1.    The Keeley's Resistance to the Motion to Dismiss

KGLP filed a motion to dismiss the bankruptcy case on January 10, 2011. The Keeleys filed an objection to the motion and argued against the motion at a hearing on the matter.   The Court ultimately denied the motion to dismiss.   The Keeleys argue that if they had not objected to the motion to dismiss, the motion likely would have been granted, and the benefits of the involuntary bankruptcy filing—including preservation of equity for all creditors beyond the first lienholders—would have been lost.

17

Slominski argues that the Keeleys did not substantially contribute to the case by objecting to the motion to dismiss because the motion was denied due to its untimeliness, not the efforts of the Keeleys.   Slominski asserts that the Keeleys are therefore incorrect in their assertion that had they not objected, the motion would have been granted.

Trustee Kaler conceded that the Keeleys' objection to the motion to dismiss the case resulted in some benefit to the case.   He stressed, however, that only those expenses clearly related to those efforts should be approved.   The Court agrees.

### a.  Larkin Hoffman Fees

KGLP filed the motion to dismiss the case on January 10, 2011.   Larkin Hoffman performed the majority of the work related to the objection to the motion to dismiss.   The first entry related to the resistance is:

> 1/11/11      Review Debtor's motion to dismiss; research question of whether petition was timely filed under Fed. R. Bankr. P. 1011; review standard for dismissal of involuntary pleadings; begin drafting response to motion (RJR/$190/$323.00/ 1.7)

These fees—while lumped—are nevertheless reasonable and are allowed.

The very next entry, however, deals with issues on their face that are not related:

> 1/11/11      Analysis of removal and transfer status for purposes of assessing strategies and procedures in dealing with pending non-bankruptcy actions (KHL/$220/$88.00/0.4)

The 30 total pages of entries are replete with similar entries that either do not relate to this case at all, do not directly relate to the motion to dismiss, do not relate to work that benefitted KGLP's estate or its creditors, or are so insufficiently described that it is impossible to tell.   As an example of an entry with an insufficient description is:

> 1/18/11    Analysis of costs; revise spreadsheet regarding same (BJH/$245/$972.00/3.9673469[7])

In fact, it is far more efficient for the Court to identify those entries that appear to be directly related to the motion, rather than those that are irreparably deficient.   This should be the job of the party requesting the fees, not the Court.   Nevertheless, apparently related entries are as follows:

> 1/12/11    Develop factual background fro [*sic*] response to motion to dismiss; continue research on response to debtor's motion to dismiss regarding bona fide claim (RJR/$190/$380.00/2.0)

> 1/13/11    Continue drafting of response to motion to dismiss; research additional case law regarding whether motion to dismiss was timely filed under Rule 1011; additional changes to facts per K. Corey-Edstrom; retrieve and send relevant documents for K. Corey Edstrom; review additional caselaw regarding attorneys' fees for dismissal and bad faith; send draft response to K. Corey Edstrom for his review (RJR/$190/$1,064.00/5.6)

---

[7]   Although irrelevant because the fees from this entry are not sufficiently described so as to be compensable, the Court notes that this entry is also suspect because it is exceedingly unlikely that BJH accounts for his or her time down to the millionth of each hour.

| | |
|---|---|
| 1/14/11 | Response to motion to dismiss petition; review and supervise filing; conference with J. Reding regarding same; communicate with clients regarding filing; work on service issues for Texas motion; supervise filing of Texas Motion (KCE/$385/$1,270.50/3.3) |

The January 12, 2011, entry is allowable in the amount of $380.00.   The latter two entries have lumped work into each entry.   In spite of the lumping, the entry on January 13, 2011, seems to include only work related to the motion.   The Court will allow those fees in the amount of $1,064.00.   The same cannot be said for the entry by KCE on January 14, 2011.   Specifically problematic is "work on service issues for Texas motion; supervise filing of Texas Motion."   It is impossible for the Court to decipher how much of the 3.3 hours spent on the work included in this entry was related to the motion to dismiss.   As such, none of it is allowed. Several subsequent entries have the same deficiency—work on the motion to dismiss is lumped into entries with work that is clearly not related.

The Court heard the motion to dismiss on February 24, 2011, at the same time as the first motion to appoint an operating trustee.   Some of the time entries relate to preparation for the hearings and attendance at the hearings.   While some of these fees may be compensable as related to the motion to dismiss, the time entries refer to the work on the hearings collectively.   The Court will therefore address them in conjunction with the work related to the motion to appoint an operating trustee

below.   A total of $1,767.00[8] in Larkin Hoffman fees are directly related to

resisting the motion to dismiss and are allowed as administrative expenses.

### b.  Kennelly & O'Keeffe Fees

The work performed by Kennelly & O'Keeffe on the resistance to dismissal is

as follows:

> 1/11/11     Draft emails to Ken Corey-Edstrom and Dawn Keeley; Review
> Grabanski's objection to the involuntary filing; Meeting with
> CMK (JPD/$175/$175.00/1.0)

The portion of the entry stating: "Review Grabanski's objection to the involuntary

filing" probably refers to KGLP's motion to dismiss, but the Court should not have

to translate the entries.   This work is again lumped with other

insufficiently-described work.   Finally, and probably most importantly, this work is

duplicative of work performed by Larkin Hoffman – the firm Kennelly & O'Keeffe

hired to handle the bankruptcy.   Thus, it did not substantially contribute to the case

– and certainly not in an extraordinary way.   The Court concludes none of the

Kennelly & O'Keeffe work on the opposition to the motion to dismiss substantially

contributed to the case.

### 2.      The Appointment of an Operating Trustee

---

[8] The Court reaches the $1,767.00 total through addition of the $323.00,
$380.00, and $1064.00 in allowable fees charged for activities stated in the Jan. 11,
2011, Jan. 12, 2011, and Jan. 13, 2011, time entries respectively.

The Keeleys filed a motion to appoint an operating trustee on February 3, 2011.   According to the Keeleys, an operating trustee was necessary because the Grabanskis provided little information regarding the finances of KGLP or about KGLP's intensions moving forward toward reorganization.   The Keeley's motion sought an operating trustee to ensure proper management of KGLP's affairs and to ensure KGLP's assets were preserved for the benefit of its creditors.   No other creditors joined the Keeleys' motion.   The Court denied the motion without prejudice after a hearing on February 24, 2011.   Because the Court denied the motion, it cannot be said that the motion—or the work related to it—substantially contributed to the case.

### a.  Larkin Hoffman Fees

As noted above, some of the work performed by Larkin Hoffman in preparation for the hearings on the motion to dismiss was lumped in with the motion to appoint an operating trustee.   For example:

2/21/11      Analysis of reply brief; prepare for Thursday hearing
             (KCE/$385/$770.00/2.0)

2/21/11      Conference with J. Redding; prepare for Thursday hearings;
             review 341 transcript and portions of Rule 2004 exam; continue
             to prepare reply to objection to appoint trustee
             (KCE/$385/$2,695.00/7.0)

2/22/11    Prepare for hearings; supervise filing of reply; edit reply; conference with clients regarding fact issues; supervise and revise broker declaration (KCE/$385/$1,540.00/4.0)

2/23/11    Prepare for hearing; travel to Fargo; meeting with clients and local counsel; continue to prepare for hearing (KCE/$385/$3,850.00/10.0)

2/24/11    Finalize preparation for hearing; attend hearing and represent client at hearing; analysis of judge's ruling; travel back to Minneapolis (KCE/$385/$2,310.00/6.0)

It is impossible to determine how much of the time spent on each of these lumped entries related solely to the motion to dismiss.    Again, this is not the job of the Court – it is the job of the party requesting extraordinary fees.    The Court also notes that travel was impermissibly booked at full hourly rates.    See In re Hanson Indus., Inc., 90 B.R. at 411.    In order to provide any compensation, the Court would be required to estimate the reasonable amount of time associated only with the motion to dismiss.    The Court believes that while resisting the Motion to Dismiss was beneficial to the estate, it certainly did not require a substantial effort.    The Court concludes Larkin Hoffman is entitled to $1,000.00 of fees related to the Motion to Dismiss.    All other fees from this period relate to the unsuccessful – and thus non-compensable – first motion to appoint a trustee.

On March 22, 2011, the Keeleys filed a renewed motion to appoint an operating trustee.    They filed the renewed motion because the Grabanskis

completely failed to act for KGLP on a real offer to purchase the two parcels of land.

Creditors, Earl and Lenita Unruh and Choice Financial Group, joined the motion.

After a hearing on the matter, the Court granted the Keeleys' motion and ordered the

appointment of an operating trustee.

Slominski and Trustee Kaler both allege that the Keeleys brought the motions

to appoint an operating trustee purely out of self-interest.   While the Court largely

agrees, it also recognizes that the operating trustee did—on a macro level—make a

substantial contribution to the case.   The question is how much of the time claimed

is in fact necessary to that substantial contribution.

### b.  Kennelley & O'Keeffe Fees

Only Kennelly & O'Keeffe worked on the renewed motion to appoint an

operating trustee.   Their entries are as follows:

| 3/18/11 | Draft renewed motion to appoint trustee; Phone conference with Brian Johnson and Dawn Keeley (JPD/$175.00/$647.50/3.7) |
| --- | --- |
| 3/18/11 | Meeting with JPD; Review file; Begin drafting Renewed Motion to Appoint Operating Trustee (SM/$125/$312.50/2.5) |
| 3/20/11 | Draft renewed motion to appoint trustee (JPD/$175/$612.50/3.5) |
| 3/21/11 | Reviewed renewed motion to appoint trustee (JPD/$175/$87.50/0.5) |
| 3/21/11 | Draft renewed motion to appoint trustee (JPD/$175/$2,450.00/14.0) |

| 3/22/11 | Review Declaration of John and Dawn Keeley and Renewed Motion to Appoint Operating Trustee (SM/$125/$125.00/1.0) |
|---|---|
| 3/22/11 | Prepare Motion to expedite renewed motion to appoint trustee (BLS/$125/$87.50/0.7) |
| 3/22/11 | Draft & submit renewed motion to appoint trustee. (JPD/$175/$1,137.50/6.5) |
| 3/24/11 | Prepare for hearing. (JPD/$175/$157.50/0.9) |
| 3/25/11 | Preparation for hearing. (JPD/$175/$210.00/1.2) |
| 3/28/11 | Prepare for hearing (JPD$175/$472.50/2.7) |
| 3/29/11 | Prepare for hearing (JPD/$175/$1,977.50/11.3) |
| 3/29/11 | Prepare for hearing (CMK/$265/$2,252.50/8.5) |
| 3/30/11 | Prepare Reply to Objection to Renewed Motion to Appoint Trustee; Attend hearing (BLS/$125/$500.00/4.0) |
| 3/30/11 | Attend hearing; Phone calls with Kalin, Mark Davidson, Kip Kaler; Draft order (JPD/$175/$1,050.00/6.0) |
| 3/30/11 | Prepare for and attend hearing (CMK/$265/$927.50/3.5) |

In spite of the continued lumping in some of these entries, all of the work appears to be related to the renewed motion to appoint an operating trustee.   But not all of these fees are reasonable and necessary so as to make them recoverable by the Keeleys.

There is significant duplication of efforts that cannot be compensated from the estate.   For example, three people (JPD, CML and BLS) all billed for attending

25

the hearing for the renewed motion to appoint an operating trustee.   Their also

appears to be an unreasonably large amount of time spent on drafting the motion,

preparing for the hearing, and attending the hearing.   A total of 70.5 hours of billing

is related to this motion.   That amount of time does not properly reflect the benefit

to the estate and its creditors, especially considering that after appointment Kaler

operated for only a short period of time and then moved to convert the case to a

Chapter 7 proceeding.

The Court finds instead that 5 hours of JPD's work for drafting the "renewed"

motion,[9] 1 hour of BLS's time for preparing a reply to the objection,[10] and 4 hours

of CMK's time to prepare for and attend the hearing[11], more accurately reflects the

reasonable and necessary expense of providing this benefit to the estate.   The total

amount allowed related to the renewed motion to appoint an operating trustee is

---

[9] Resulting in a total amount of $875.00 computed from the total allowable amount of time found by the Court of 5 hours multiplied by the hourly rate for JPD of $175.00.

[10] Resulting in a total amount of $125.00 computed by the process described in footnote 10 using BLS's hourly rate.

[11] Resulting in a total amount of $1,060.00 computed by the process described in footnote 10 using CMK's hourly rate.   No single time entry was dispositive for the Court in finding a total of 4 allowable hours; the Court reached this amount by examining several time entries.

$2,060.00.[12]

## C.   After the Trustee's Appointment and Before Conversion to Chapter 7

The Keeleys also attempt to recover attorney fees they incurred after the Trustee was appointed.   Under § 503(b)(3)(D), the allowance of administrative expenses is limited to substantial contributions "in a case under chapter 9 or 11 of this title."   The Keeleys recognize that creditors are not entitled to reimbursement for fees and expenses incurred after the Court converted the case from Chapter 11 to Chapter 7.   The Keeleys argue only that they substantially contributed to the case by helping Trustee Kaler before the conversion to Chapter 7 on October 11, 2011.

Specifically, the Keeleys assert their substantial and extraordinary contributions included providing Trustee Kaler with insight on the Grabanskis' Texas farming operation before bankruptcy, the events giving rise to the fraudulent lease with Louis Slominski, Jr., and purchase offers for the property.   In short, they claim they provided Trustee Kaler with inside information to ensure he would be able to successfully manage KGLP as trustee.   The Keeleys claim $26,044.25 to Kennelly & O'Keeffe and $3,015.31 to Larkin Hoffman, for a total of $29,059.56, in administrative priority expenses related to these aspects of the case.

---

[12] The Court reaches the $2,060.00 total through addition of the $875.00, $125.00 and $1060.00 in allowable fees for JPD, BLS and CMK respectively.

None of the Keeleys' legal fees incurred after the appointment of Kaler as

Chapter 11 trustee qualify under the substantial contribution standard of

§ 503(b)(3)(D).   Once the court declined to dismiss the case and ordered the

appointment of a trustee, the estate and other creditors received no further benefit –

let alone a substantial benefit – from the Keeleys' efforts.   Trustee Kaler assumed

responsibility for KGLP and its assets.   He explained to the Court that the Keeleys

were helpful to him but did not provide any unique or extraordinary assistance to the

estate.   Moreover, he would have worked directly with the Keeleys to gather

information from them had they not been represented.   The Keeleys also stood to

personally benefit from sharing information.   A greater recovery by the estate could

significantly reduce what was still owed to creditors, and thus also reduce the

Keeleys' liability exposure for any remaining amounts.   As noted above, service

personally benefitting the party claiming the expense are not allowed.

## CONCLUSION

The Court concludes that the Keeleys are entitled to some administrative

expense under 11 U.S.C. §§ 503(b)(3)(A) and (b)(4), but for far less than the

amounts they have attempted to recover.   For the various reasons cited above, the

Keeleys' application for an administrative expense claim for legal fees and expenses

28

is allowed as follows: Larkin Hoffman fees of $6,896.50 and Kennelly & O'Keeffe

fees and expenses of $5,099.00.

The Court has considered all other arguments and deems them to be without

merit.

**SO ORDERED.**

Dated:   August 15, 2013

**THAD COLLINS, JUDGE**
**U.S. BANKRUPTCY COURT**
**SITTING BY DESIGNATION**

29